# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1702 | **DATE** | 12/20/2001 |
| **CASE TITLE** | Dabertin vs. HCR Manor Care Inc | | |

MOTION: 
[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

<br>

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☑ Status hearing set for 2/6/2002 at 10:45 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
　　☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ☑ [Other docket entry] **Enter memorandum opinion and order on parties cross motions for summary judgment. Defendant's motion for summary judgment [54-1] is granted in part (as to counts II, part of III, IV to VII of the second amended complaint) and denied in part (as to count I and part of count III). Plaintiff's cross motion for summary judgment [65-1] is denied.**

(11) ☑ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | 2 number of notices | |
| ✓ | Notices mailed by judge's staff. | DEC 2 1 2001 date docketed | 84 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | 12/20/200 date mailed notice | |
| | Copy to judge/magistrate judge. | | |
| SM | courtroom deputy's initials | SM mailing deputy initials | |
| | Date/time received in central Clerk's Office | | |

DOCKETING
01 DEC 20 PM 3: 50

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

DEC 2 1 2001

|  |  |
|---|---|
| JUDY DABERTIN, | ) |
| Plaintiff, | ) |
| v. | ) |
| HCR MANOR CARE, INC., MANOR CARE, INC. SEVERANCE PLAN FOR SELECTED EMPLOYEES, MANOR CARE, INC., MANOR CARE, INC. SEVERANCE PLAN FOR SELECTED EMPLOYEES COMMITTEE, AND MANOR CARE INC. SEVERANCE PLAN FOR SELECTED EMPLOYEES PLAN ADMINISTRATOR, | ) |
| Defendants. | ) |

Case No. 99 C 1702

Magistrate Judge Ian H. Levin

## MEMORANDUM OPINION AND ORDER

Before the court are the parties cross-motions for summary judgment in the cause.

## BACKGROUND FACTS

Defendants Manor Care, Inc. and Health Care and Retirement Corporation ("HCR") Manor Care, Inc. (collectively "Manor Care") operate skilled nursing facilities. *See generally,* Defs.' 56.1(a)(3) St. In 1998, in preparing for a merger with HCR, Manor Care adopted the Severance Plan for Selected Employees (the "Plan"). *Id.* ¶ 7. Manor Care selected thirty-nine employees comprised of officers and senior management to participate in the Plan. *Id.* ¶ 8. The thirty-nine employees were among Manor Care's most highly compensated employees. *Id.* Plaintiff Judy Dabertin, who was a Vice-President/General Manager of Manor Care, was one of the selected employees. *Id.*



The Plan provided severance benefits which included a lump-sum payout of benefits, a bonus, insurance coverage, and outplacement services for Manor Care's thirty-nine selected employees. Defs.' 56.1(a)(3) St. ¶ 9. Article III of the Plan provides that employees were eligible for benefits as follows:

> A Participant shall be entitled to severance benefits under this Plan if and only if his employment with the Company . . . terminates under either of the following circumstances:
>
>> (A) a termination by the Company . . . other than for Cause, or
>> (B) a termination by the Participant for Good Reason.

*Id.* ¶ 10. Article 1.8 of the Plan states that "Good Reason" includes:

> (i) a significant reduction in the scope of a Participant's authority, position, title, functions, duties or responsibilities . . . , (iii) any reduction in a Participant's base salary, (iv) a significant change in the Company's annual bonus program adversely affecting the Participant, or (v) a significant reduction in the other employee benefits provided to a Participant . . .

*Id.* ¶ 11.

In accordance with the Plan's provisions, a Committee was appointed by Manor Care's Board of Directors. Defs.' 56.1(a)(3) St. ¶ 12. The Committee had discretion to "interpret the provisions of the Plan and . . . determine all questions arising in the administration thereof, including without limitation the reconciliation of any inconsistent provisions, the resolution of any ambiguities, the correction of defects, and the supplying of omissions." *Id.* The Plan further provided that "[i]n the event that a claim for a benefit under the Plan has been denied, the decision shall be subject to review by the Committee upon written request of the claimant . . . " *Id.* ¶ 13. Therefore, "[t]he decision of the Committee upon review shall be final and binding on all persons." *Id.*

In September, 1998, Manor Care merged with HCR and became a wholly owned subsidiary

of HCR. *Id.* ¶ 29.

Mr. M. Keith Weikel, who had been selected to serve as the Chief Operating Officer of the new entity, asked Plaintiff to continue serving in her role as Vice-President/General Manager. Defs.' 56.1(a)(3) St. ¶ 21. Mr. Weikel told Plaintiff that if she accepted the position she would continue to receive the same salary and she would be assigned to the Western Division of Manor Care. *Id.* ¶¶ 22, 23. Mr. Weikel informed Plaintiff that she did not need to relocate to the West Coast, but that he wanted her to "be in the facilities between four and five days a week." *Id.* ¶ 24. Plaintiff accepted Mr. Weikel's job offer to serve as Vice-President/General Manager of the new entity. *Id.* ¶ 28. In addition, the Board of Directors elected Plaintiff as an officer of both HCR Manor Care and Manor Care. *Id.* ¶ 30.

Prior to the merger, Vice-Presidents/General Managers generally visited each facility under his or her care once a year and relied on regional directors to take care of routine tasks; such as, quality of care issues, regulatory compliance, staffing issues, and customer satisfaction. Defs.' 56.1(a)(3) St. ¶ 32. Mr. Weikel and Mr. Paul A. Ormond, Manor Care's President, however, believed that Manor Care's top managers could not rely on subordinates to manage the facilities assigned to them. *Id.* at ¶ 33. Instead, they required that top management be personally involved in the day-to-day operations of the facilities. After the merger, Vice-Presidents/General Managers could no longer delegate work to the regional directors and were required to work in the facilities four to five days a week. *Id.* ¶¶ 33, 34. The Vice-Presidents/General Managers, however, retained the duties, authority, responsibilities, and functions that they had prior to the merger. *Id.* ¶ 34.

Plaintiff was assigned to the Central and Western Divisions before the merger. Defs.' 56.1(a)(3) St. ¶ 36. However, because the facilities in the Western Division were geographically

dispersed, and there was a vast distance between the facilities in the Central and Western Divisions, Mr. Weikel assigned Plaintiff only the Western Division after the merger so that she could handle her intensified job assignment. *Id.* The Western Division had a smaller number of facilities, beds, direct reports, and construction projects, and less budgeted revenue and operating profit than the combined Western and Central Divisions. *Id.* ¶ 37. Plaintiff, however, retained the same scope of duties, responsibilities, functions, and authority in her smaller business unit. *Id.*

In addition, due to the deteriorating performance of the Western Division's facilities, Manor Care decided to work on improving the performance of its existing facilities and stopped construction development of facilities in the Western Division. Defs.' 56.1(a)(3) St. ¶ 38. Plaintiff, however, continued to be assigned all of the same duties, responsibilities, functions and authority for construction development, even though she spent less time working in that area after the merger. *Id.* Instead, Mr. Weikel required that Plaintiff focus more time on her duties and responsibilities as they related to the profitability and performance of existing facilities. *Id.* Plaintiff, thus, retained the same duties, responsibilities, functions and authority that she had prior to the merger. *Id.*

On October 21, 1998, approximately two months after the merger, Plaintiff resigned from her position at Manor Care. Defs.' 56.1(a)(3) St. ¶ 39. Plaintiff told Mr. Weikel that she was resigning because she was "unhappy with her assignment" and "needing to spend all week, every week 2,000 miles away from home." *Id.* ¶ 40.

After Plaintiff resigned, she submitted a claim for benefits to Mr. Weikel. Defs.' 56.1(a)(3) St. ¶ 41. The basis of her claim was that, in accordance with the Plan provisions, she had "Good Reason" to resign from her position because *inter alia* the number of facilities, beds, direct reports, and construction projects assigned to her had decreased. *Id.*

4

Mr. Weikel denied Plaintiff's claim for benefits. Defs.' 56.1(a)(3) St. ¶ 43. Mr. Weikel sent Plaintiff a letter dated November 16, 1998 in which he explained that "a reduction in the size of the business unit you were assigned to manage [does not] alone constitute[] a reduction in the scope of your authority, functions, duties or responsibilities." *Id.* He also stated in the letter that "[i]n fact, you continue[d] to have the full range of authority, duties, responsibilities and functions with respect to the facilities in your division as you did prior to the merger." *Id.*

On November 18, 1998, Plaintiff appealed Mr. Weikel's decision to the Committee. Defs.' 56.1(a)(3) St. ¶ 45. Mr. Weikel recused himself from the review of her claim and the Committee granted Plaintiff an opportunity to make a written submission explaining the basis of her claim. *Id.* ¶¶ 46, 48. On January 12, 1999, Plaintiff's attorney submitted a twenty-two page single-spaced letter (position paper) explaining her claim. *Id.* ¶ 49.

On January 14, 1999, Mr. Ormond and three other Committee members met to determine if Plaintiff was entitled to receive benefits under the Plan. Defs.' 56.1(a)(3) St. ¶ 51. The Committee considered her twenty-two page submission, Plaintiff's letter to Mr. Weikel seeking benefits under the Plan, and Mr. Weikel's letter denying her claim. *Id.* ¶ 50. Mr. R. Jeffrey Bixler also attended the meeting as legal counsel and acted as secretary during the meeting. Defs.' 56.1(a)(3) St. ¶ 54. Mr. Ormond asked Mr. Bixler to prepare a draft of the issues that were discussed by the Committee. *Id.* ¶ 56.

The Committee accepted the factual allegations in Plaintiff's position paper as true. Defs.' 56.1(a)(3) St. ¶ 65. The Committee, however, decided that even if Plaintiff had correctly stated the facts, she did not have "Good Reason" to resign from her position. *Id.* Thus, the Committee rejected Plaintiff's allegations that there was a significant reduction in the scope of her authority, position,

title, functions, duties, or responsibilities after the merger. *Id.* ¶ 66. Moreover, the Committee rejected Plaintiff's claim that there was a significant change in Manor Care's bonus program that adversely affected her and that she suffered a significant reduction in employee benefits because she did not receive a stock option grant. *Id.* ¶¶ 69, 74.

On January 18, 1999, the Committee faxed Plaintiff a copy of the minutes outlining the issues discussed on January 14, 1999 and its decision to deny her claim. Defs.' 56.1(a)(3) St. ¶ 60. The Committee also mailed a copy of its final decision to Plaintiff on January 19, 1999. *Id.* ¶ 62.

## LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party had produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and to draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 964 (7th Cir. 1998). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Linc*, 129 F.3d at 920. A genuine issue

6

of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505 or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## ANALYSIS

Plaintiff's threshold argument is that Defendants violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by wrongfully denying Plaintiff's claim for severance benefits under the Plan. Plaintiff further contends that Defendants (1) failed to comply with ERISA's disclosure requirements, (2) violated ERISA's fiduciary duties, (3) breached its contract with Plaintiff by failing to pay her severance benefits and a bonus, and (4) violated the Illinois Wage Payment and Collection Act by failing to pay her severance benefits and a bonus. *See generally,* 2d Am. Cmplt.

## I. SEVENTH CIRCUIT LAW GOVERNS PLAINTIFF'S ERISA CLAIM.

Plaintiff initially argues that Third Circuit law is applicable to this cause. Pl.'s Mem. at 7. Plaintiff bases her assertion on Article 6.7 (choice of law provision) of the Plan which states that "[t]his Plan shall in all respects be governed by and construed in accordance with the laws of the State of Delaware." *Id.* Defendant, on the other hand, asserts that Seventh Circuit law is controlling. Defs.' Reply at 3.

Claims that are brought under federal law must be decided under the decisional law of the Circuit in which the claim was filed. *In re RealNetworks, Inc.*, 2000 WL 631341, at *4-5 (N.D. Ill.

2000). *In re RealNetworks, Inc.,* Michael Keel, an intervenor, sought to avoid Seventh Circuit law

by asserting that the License Agreement at issue contained a "choice of law provision designating

Washington law as governing the License Agreement." *Id.* at *4. Keel further claimed that the

License Agreement "expressly designates the application of Ninth Circuit decisional law to the

License Agreement." *Id.* Judge Kocoras held that the choice-of-law provision meant only that

"where application of state or common law is necessary, a court applies Washington law" and found

that "there exists no express choice of law provision selecting Ninth Circuit decisional law . . . " *Id.*

at *4-5. Accordingly, this court finds Plaintiff's assertion that Third Circuit law governs this cause

unavailing because there is no express choice of law provision in the Plan that selects Third Circuit

decisional law. Therefore, Seventh Circuit law is controlling.[1]

## II.     ERISA GOVERNS THE PLAN.

### A.     The Plan Requires An "Ongoing Administrative Scheme."

Plaintiff initially argues that ERISA does not apply to this cause because the Plan does not

require an "ongoing administrative scheme" as required by the *Fort Halifax* test. *Fort Halifax*

*Packing Co. v. Coyne,* 482 U.S. 1, 11; 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987); Pl.'s Mem. at 7.

Plaintiff asserts that the *Fort Halifax* test has not been met because it requires claim processing "on

---

[1]In this case, the parties could not choose Third Circuit law. A "federal judge[] [has the] obligation to decide issues of federal law correctly, and not according to the interpretation of a court sitting in another circuit." *Fossett Corp. v. Gearhart,* 694 F.Supp. 1325, 1328 (N.D. Ill. 1988) (plaintiff designates a choice of law when deciding where to file a lawsuit and moreover, after transfer of venue under 28 U.S.C. § 1404, transferee court should honor plaintiff's choice of law by applying the state law that the transferor court would have applied but should apply the federal law established by the court of appeals in its circuit). *See also In re Korean Air Lines Disaster,* 829 F.2d 1171, 1176 (D.C. Cir. 1987) (Ginsburg, J.) ("[E]ach [federal court] has an obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit.")

8

a regular basis" and evidence of claim processing "on a regular basis" is absent. Pl.'s Mem. at 7. Plaintiff, further, argues that the Plan's administrative scheme was not "ongoing" because it was terminable after two years. *Id.* at 8. Defendant, on the other hand, argues that ERISA governs the Plan and that there is sufficient evidence to demonstrate that the Plan does require an "ongoing administrative scheme." Def.'s Mem. at 11-14.

In *Fort Halifax*, the Court determined that an agreement to pay severance benefits is subject to ERISA's control only if it creates benefits requiring "an ongoing administrative program to meet the employer's obligations." *Fort Halifax*, 482 U.S. at 11; 107 S.Ct. 2211, 96 L.Ed.2d 1. To further explain the meaning of the term "ongoing," the court held that, if under the agreement, the employer has not assumed a responsibility to process claims and pay benefits "on a regular basis," it "faces no periodic demands on its assets that create a need for financial and control," and a benefit plan subject to ERISA has not been established. *Id.* at 12.

When determining whether a plan requires an "ongoing administrative scheme," "[t]he question is not whether the employer put the administrative scheme into place, but whether properly putting the plan into effect would necessitate an ongoing administrative scheme." *Bongiorno v. Associates In Adolescent Psychiatry, S.C.*, 1993 WL 313096, at *5 (N.D. Ill. Aug. 13, 1993) (citations omitted); *see also Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir. 1992) ("[w]hether or not Allied-Signal ever thought it would have to administer an ERISA plan does not matter; there was no way to administer the program without an administrative scheme.") Moreover, properly putting a plan into effect necessitates an "ongoing" administrative scheme when an employer must apply a plan's eligibility criteria to each participant's particular circumstances:

Simple or mechanical determinations do not necessarily require the

> establishment of . . . an administrative scheme; rather, an employer's
> need to create an administrative system may arise where the
> employer, to determine the employee's eligibility for and level of
> benefits, must analyze each employee's particular circumstances in
> light of the appropriate criteria.

*Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1375 (7th Cir. 1997) (quotation omitted).

In applying the above rationale, the Seventh Circuit determined that a severance plan similar to the Plan at issue required an "ongoing administrative scheme." *Collins v. Ralston Purina Co.,* 147 F.3d 592 (7th Cir. 1998). In that case, Golden Cat entered agreements with its employees to pay them severance benefits if they suffered "any substantial reduction of duties or responsibilities" during the year after Ralston Purina acquired Golden Cat. *Id.* at 594. After Ralston Purina acquired Golden Cat, Peter Collins quit his job and sued Golden Cat in state court claiming that he was entitled to benefits because his duties had been substantially reduced. *Id.* Golden Cat removed the action on the grounds that ERISA preempted Collins' claims. *Id.* at 595.

The Seventh Circuit held that Golden Cat had properly removed the action because ERISA governed the agreements. *Collins,* 147 F.3d at 595-97. The court found that "the triggering event [a substantial reduction of duties] prompting a payout in this case presupposes . . . an ongoing administrative scheme." *Id.* at 596. The substantial reduction requirement "sets a standard, but hardly an easily discernible one." *Id.* The court found that "[t]he result is that Golden Cat had to assess the new job duties of Collins and compare them to his previous responsibilities; even then the company somehow had to determine if the difference between the two was 'substantial.'" *Id.* Because this determination was not mechanical and required the plan administrator to make a particularized discretionary analysis of each claim for benefits, the agreements required an ongoing administrative scheme. *Id.* at 597; *see also Cvelbar*, 106 F.3d at 1375.

10

The Seventh Circuit also found that the agreements required an "ongoing administrative scheme" because "Golden Cat faced a year in which various managers might demand payouts under the individual agreements . . ." *Collins,* 147 F.3d at 596. Golden Cat could not make a single set of payments to all managers at once; instead, it "faced the prospect of multiple payments to various managers, at different times and under different circumstances." *Id.* at 595. The court held that a severance plan required an ongoing administrative scheme when an employer is faced with the "prospect of multipl[e]" claims over a one-year period. *Id.* Moreover, the prospect of periodic demands for benefits created a need for financial coordination and control. *Id.* at 596.

The court finds Plaintiff's arguments that the *Fort Halifax* test has not been met because there is no evidence of claim processing "on a regular basis" and the Plan lacks an "ongoing administrative scheme" because it is terminable after two years unavailing. First, Plaintiff, in asserting her claims, relies on a Tenth Circuit, unpublished decision, *Lettes v. Kinam Gold, Inc.,* 2001 WL 55499 (10th Cir. 2001), to support her position. The court finds that the decision in *Lettes* has no precedential value in this Circuit. *See* Tenth Cir. R. 36.3(a). Moreover, the court "must follow the decisions of [the Seventh Circuit] even if [it] believes them profoundly wrong." *United States v. Burke,* 781 F.2d 1234, 1239, n.2 (7th Cir. 1985); *Lashbrook v. Oerkfitz,* 1994 WL 369665, at *7 (N.D. Ill. July 8, 1994).[2]

---

[2]When a District Court is "powerfully convinced that the [Seventh Circuit] would overrule [controlling authority] at the first opportunity," the District Court may decline to follow that authority. *Brenner v. Brown,* 814 F.Supp 717, 718 (N.D. Ill. 1993). Here, however, there is no reason for the court to believe that the Seventh Circuit would overrule *Collins.* Furthermore, Plaintiff notes that in *Collins,* the Seventh Circuit relied on *Bogue v. Ampex Corp.,* 976 F.2d 1319 (9th Cir. 1992) and *Simas v. Quaker Fabric Corp.,* 6 F.3d 849 (1st Cir. 1993). Pl.'s Mem. at 7-8 n.8. Plaintiff claims that the Seventh Circuit's reliance on *Bogue* is "undercut" by the Ninth Circuit's more restrictive decisions in *Velarde v. Pace Marketing Warehouse, Inc.,* 105 F.3d 1313 (9th Cir. 1997) and *Delaye v. Agrepac, Inc.,* 39 F.3d 235 (9th Cir. 1994). Pl.'s Mem. at 7-8,

11

The court finds that the Plan requires an "ongoing administrative scheme." Like the agreements in *Collins,* the Plan at issue required payment of severance benefits if a selected employee suffered a "significant reduction in the <u>scope</u> of a Participant's authority, position, title, functions, duties, or responsibilities." Plan § 1.8 (emphasis in original). This triggering event presupposes an "ongoing administrative scheme" because it requires the Committee to make a discretionary analysis of each employee's circumstances in light of the eligibility criteria. Thus, under the Plan, Defendants were required to make individualized determinations regarding employee eligibility for benefits.

The Plan requires an "ongoing administrative scheme" because Defendants were faced with the "prospect of multipl[e]" claims over a two year period. *See Collins,* 147 F.3d at 595. For instance, the Plan provided for thirty-nine participants who could seek benefits from 1998 through 2000. *Id.* § 6.8; Defs.' Ex. A. Moreover, because Defendants processed benefit payments for 25 eligible claimants totaling $12,167,098, there was clear evidence of claim processing "on a regular basis." Defs.' 56.1(a)(3) St. ¶ 18; Pl.'s 56.1(b)(3) St. ¶ 18. Each of these 25 claims required financial coordination and control because *inter alia* payments had to be authorized, checks had to be issued, and insurance coverage had to be arranged. Defs.' 56.1(a)(3) St. ¶ 17; Pl.'s 56.1(b)(3) St. ¶ 17.

---

nn.7-9. But the Seventh Circuit considered both of these decisions in *Collins* and still concluded that ERISA governed the severance plan at issue. *Collins,* 147 F.3d at 597; *see also id.* at 603-04 (Rovner, J., dissenting).

Plaintiff also claims that the Seventh Circuit's reliance on *Simas* is "undercut by the more restrictive decision in *Belanger v. Wyman-Gordon, Co.,* 71 F.3d 451 (1st Cir. 1995). Pl.'s Mem. at 7-8 n.8. However, the First Circuit issued its opinion in *Belanger* nearly two years before the Seventh Circuit decided *Collins.* The Seventh Circuit, therefore, does not agree that the *Belanger* opinion "undercut" the *Simas* opinion. Since the Seventh Circuit has already considered and rejected Plaintiff's arguments, there is no reason to believe that the court would overrule itself at the first opportunity.

Accordingly, the court finds that the Plan is governed by ERISA because it requires an "ongoing administrative" scheme.

### B.     The Plan Has Reasonably Ascertainable Terms.

Defendants assert that the Plan is governed by ERISA because it has reasonably ascertainable terms. Defs.' Mem. at 14.  Plaintiff, on the other hand, does not dispute that the Plan has reasonably ascertainable terms. *See generally,* Pl.'s Mem.

A plan has reasonably ascertainable terms if "a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Cvelbar,* 106 F.3d at 1378 (quotation omitted). Under this standard, the court finds that the benefits, beneficiaries, and benefit procedures are reasonably described in the Plan. Plan (Defs.' Ex. 13) art. IV, at 4-5 (benefits); *id.* Def.'s Ex. A (beneficiaries); *id.* § 5.2 (benefits procedures).  Moreover, a reasonable reading of the Plan leads to an understanding that its benefits will be paid out of Manor Care's general funds. *See Cvelbar*, 106 F.3d at 1378.  Therefore, this court finds that because the Plan has reasonably ascertainable terms and requires an "ongoing administrative scheme" to implement its benefits, ERISA clearly governs the Plan.

## III.     THE ARBITRARY AND CAPRICIOUS STANDARD APPLIES HEREIN.

Plaintiff argues that the court should review the Committee's decision *de novo* because the Plan does not "indicate[] with the requisite . . . clarity that a discretionary determination is envisaged." Pl.'s Mem. at 9 (*quoting Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000)).  In addition, Plaintiff argues that *de novo* review is warranted because there were multiple conflicts of interest. Pl.'s Mem. at 9-13. Defendant, however, asserts that the court should review the Committee's decision under the arbitrary and capricious standard delineated in *Firestone Tire*

*& Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Defs.' Mem. at 15-16.

Where an ERISA plan gives the administrator discretion to interpret the plan terms or determine benefits eligibility, courts review the denial of benefits using the arbitrary and capricious standard. *Firestone,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80; *James v. General Motors Corp.,* 230 F.3d 315, 317 (7th Cir. 2000). "No magic words are required to confer discretion." *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan,* 144 F.3d 1014, 1020 (7th Cir. 1998). The test in the Seventh Circuit is whether the plan language "indicates with the requisite if minimum clarity that a discretionary determination is envisaged." *Herzberger,* 205 F.3d at 331.

In *Howe v. Zurich Am Ins. Co.,* 89 F.Supp.2d 1011, 1012 & n.3 (N.D. Ill. 2000), the plan described the administrator's discretion as follows:

> The Plan Administrator shall have the sole responsibility for the administration of the Plan subject to duties that it has delegated to third parties. Except as herein expressly provided, the Plan Administrator shall have the exclusive right to: interpret the provisions of the Plan, determine any questions arising hereunder or in connection with the administration of the Plan (including the remedying of any omission, inconsistency or ambiguity). The Plan Administrator's decision or action in respect thereof shall be conclusive and binding upon any and all Participants, Dependents, or former Participants.

In reviewing the plan language, District Judge Shadur held that "[i]t would be difficult to draft a plainer vesting of discretion [to interpret the plan or determine eligibility]." *Id.; see also Carr v. The Gates Health Care Plan,* 195 F.3d 292, 295 (7th Cir. 1999); *Chojnacki v. Georgia-Pacific Corp.,* 108 F.3d 810, 815 (7th Cir. 1997). Moreover, when the Seventh Circuit reviewed similar plan language, it held that the language, "clearly imparts discretionary authority to the plan administrator." *Ross*

*v. Indiana State Teacher's Assoc. Ins. Trust*, 159 F.3d 1001, 1008 (7th Cir. 1998).[3]

The court finds that the Plan at issue imparts discretionary authority to the Committee. As in *Howe and Ross,* the Committee clearly has the discretion to interpret plan terms and determine eligibility:

> The Plan shall be administered by the Committee. The Committee shall interpret the provisions of the Plan and shall determine all questions arising in the administration thereof, including without limitation the reconciliation of any inconsistent provisions, the resolution of any ambiguities, the correction of defects, and the supply of omissions. Any such determination by the Committee shall be conclusive and binding on all persons . . .

Plan § 5.1. The Plan further states that "[i]n the event that a claim for a benefit under the Plan has been denied, the decision shall be subject to review by the Committee . . . The decision of the Committee upon review shall be final and binding on all persons." *Id.* § 5.2.

Moreover, the court rejects Plaintiff's assertion that the Plan does not "indicate[] with the requisite . . . clarity that a discretionary determination is envisaged." (*quoting Herzberg*, 205 F.3d at 331.) Judge Shadur rejected this very argument in *Howe,* holding that language conferring discretion on a plan administrator, which was substantially similar to the language in the Plan, "is clearly not vulnerable to the concern just addressed by our Court of Appeals in *Herzberg v. Standard Ins. Co,* 205 F.3d 327 (7th Cir. 2000)." *Howe,* 89 F.Supp.2d at 1012 n.3.

The court's threshold determination is that because the Plan imparts discretionary authority

---

[3]In *Ross,* the plan described the administrator's discretion as follows:

> The Plan Administrator shall have the right to interpret the terms and provisions of the Benefit Plan and to determine any and all questions arising under the Benefit Plan or in connection with the administration of the Benefit Plan, including, without limitation, the right or remedy or resolve possible ambiguities, inconsistencies, or omissions, by general rule or particular decision. *Id.*

to the Committee, the court will review the Committee's decision under the arbitrary and capricious standard. Plaintiff, however, asserts that there are multiple conflicts of interest that exist that warrant *de novo* review. Pl.'s Mem. at 9-13. The court must "presume that a fiduciary is acting neutrally unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict." *Mers,* 144 F.3d at 1020.

### A.    Manor Care's Cost-Cutting Goals Did Not Create a Conflict Of Interest.

Plaintiff argues that, like most American corporations, Manor Care encouraged its officers to cut costs where possible. Pl.'s Mem. at 11. Plaintiff asserts that the Committee, which was made up of Manor Care officers,' had a conflict of interest in paying Plaintiff $885,000 in benefits because to do so would be inconsistent with Manor Care's cost-cutting goals. *Id.* Plaintiff also asserts that the Committee members had an incentive to deny her claim in order to enhance the value of their stock options and bonuses. *Id.* Defendant, however, asserts that under Seventh Circuit law Manor Care's cost-cutting goals did not create a conflict of interest.

Seventh Circuit precedent has repeatedly rejected Plaintiff's argument that plan administrators have a conflict of interest simply because they are corporate officers who have a motive to cut costs. *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan,* 195 F.3d 975, 981 (7th Cir. 1999); *Carr,* 195 F.3d at 295; *Mers,* 144 F.3d at 1020-21; *Chojnacki,* 108 F.3d at 815. The Seventh Circuit has explained that "[i]f the corporation's financial interests were a cause for concern, ERISA would take measures to prohibit corporate officers from serving as plan administrators." *Carr,* 195 F3d at 295. As the Seventh Circuit has held, "companies who develop reputations for being tight-fisted when it comes to paying benefit claims might have trouble attracting new talent and be forced to pay higher wages." *Chojnacki,* 108 F.3d at 815. Moreover,

"[w]hen the administrator is a large corporation, the firm has a financial interest [in awarding benefits under an unfunded ERISA plan], but the award in any case will have only a trivial effect on its operating results." *Perlman,* 195 F.3d at 981.

To measure the effect of a benefits claim on operating results, the Seventh Circuit compares the claim to the corporation's revenues. *Chojnacki,* 108 F.3d at 815-16 (where Georgia-Pacific's total revenue was $12.3 billion and nine plaintiffs sought benefits ranging from $64,000 to $134,000, paying benefits "would not have seriously affected Georgia-Pacific's bottom line or caused the value of the company's stock to take a hit"); *Chalmers v. Quaker Oats Co.,* 61 F.3d 1340, 1344 (7th Cir. 1995) (administrator of Quaker's unfunded severance plan did not have automatic bias against dispensing benefits because Quaker "generates revenues of nearly $6 billion annually and is therefore not likely to flinch at paying out $240,000"). Moreover, in *Chojnacki,* because benefit claims would not seriously affect Georgia-Pacific's bottom line or stock value, the plan administrator's ownership of Georgia-Pacific stock "did not undermine his impartiality." *Chojnacki,* 108 F.3d at 815.

The court finds, that under the Seventh Circuit's test for measuring the effect of a benefits claim, Plaintiff's argument fails. In 1999, the year in which the Committee denied Plaintiff's claim, Manor Care and its parent had revenues of over $2 billion. Defs.' 56.1(a)(3) St. ¶ 20; Pl.'s 56.1(b)(3) St. ¶ 20. Therefore, in applying the Seventh Circuit test, the court finds that Plaintiff's claim for $885,000 would not have seriously affected Manor Care's and HCR Manor Care's bottom lines or Manor Care's stock value. Moreover, Manor Care paid out severance benefits to 25 eligible claimants under the Plan totaling $12,167,098. Defs.' 56.1(a)(3) St. ¶ 18; Pls.' 56.1(b)(3) St. ¶ 18. Therefore, the court finds that Manor Care's denial of Plaintiff's claim for benefits could not have been reasonably based on Manor Care's cost-cutting goals.

## B.     Plaintiff Has No Evidence That Mr. Weikel Was Biased Against Her.

Plaintiff alleges that Mr. Weikel was biased against her because she refused to repay a $15,000 sign-on bonus in 1990 after she had worked for HCR for only three months. Pl.'s Mem. at 12. Plaintiff asserts that Mr. Weikel's bias created a conflict of interest for the Committee. *Id.* Defendant, however, asserts that Plaintiff has produced no evidence that Mr. Weikel was biased against her or attempted to poison the Committee against her. Defs.' Mem. at 11.

The record demonstrates that Plaintiff has no evidence that Mr. Weikel bore a grudge against her because she refused to repay the bonus. Dabertin Dep. at 85:9-86:9 (admitting that she had never heard from Mr. Weikel or anyone else that he disliked her or that he bore a grudge against her because she refused to repay the bonus).[4] Mr. Weikel, however, did tell several people that Plaintiff had previously worked for HCR, but he did not say anything about Plaintiff's failure to repay the bonus.[5] Weikel Dep. at 39:3-15; Dabertin Dep. at 85:23-88:8.

Mr. Weikel also recused himself from the Committee's review of his decision to deny Plaintiff's claim for benefits. Weikel Dep. at 9:21-10:3; Bixler Dep. at 42:17-43:4. Thus, any alleged bias that Mr. Weikel might have had against the Plaintiff would not have affected the

---

[4]Plaintiff claims that Mr. Weikel's decision not to assign her both the Central and Western Divisions after the merger shows that he was biased against her. Pl.'s Mem. at 12. Mr. Weikel, however, assigned Plaintiff only the Western Division so that she would be able to handle her newly intensified job in geographically dispersed facilities. Weikel Dec. ¶ 10.

[5]During her deposition, Plaintiff initially claimed that Mr. Weikel had told Mr. John McKenna, a senior vice-president, about the sign-on bonus. Dabertin Dep. at 59:13-60:6. Plaintiff, however, later stated that she was "not sure" if Mr. Weikel told Mr. McKenna about the bonus and stated that Mr. McKenna might have learned about her refusal to repay the bonus from "some other source." *Id.* at 82:23-83:6. When asked: "[A]s far as you know he [Mr. Weikel] did not say anything to anybody about the fact that you would not repay the bonus in 1990," Plaintiff responded, "[t]hat is correct." *Id.* at 88:3-8.

Committee's decision. "If anything, . . . he did communicate [to other Committee members] a heightened concern for neutrality." *Id.* Moreover, Plaintiff's claim that Mr. Weikel's "recusal is suspect" because he received copies of correspondence Plaintiff (Pl.'s Mem. at 12 n.23) sent to the Committee is not probative of whether Mr. Weikel participated in the Committee's review of Plaintiff's benefits denial.

Accordingly, the court finds that because the record demonstrates that there is no evidence that Mr. Weikel discussed his denial of Plaintiff's claim with any of the Committee members (Bixler Dep. at 43:5-12; Weikel Dep. at 9:16-20), and the fact that Mr. Weikel was not present during the Committee's January 14, 1999 meeting in which it decided to deny Plaintiff's claim for benefits (Edwards Dep. at 35:22-36:2, 67:22-69:3; Meyers Dep. at 9:19-10:7) that any alleged bias that Mr. Weikel might have had against Plaintiff could not have reasonably created a conflict of interest for the Committee in deciding Plaintiff's claim. Moreover, no one spoke on Mr. Weikel's behalf during the January 14, 1999 meeting. Edwards Dep. at 68:14-69:6.

### C. The Committee, Not Mr. Bixler, Decided Plaintiff's Claim.

Plaintiff asserts that the Committee delegated its authority to decide her claim to Mr. Bixler. Pl.'s Mem. at 10, 12. Defendant, on the other hand, claims that the Committee decided Plaintiff's claim and that Mr. Bixler merely acted as a secretary and legal counsel for the Committee. Defs.' Mem. at 13-14.

The record indicates that Mr. Bixler attended the January 14, 1999 meeting, in his role as legal counsel to the Committee. O'Brien Dep. at 27:3-7; Meyers Dep. at 31:12-15. At Mr. Ormond's request, Mr. Bixler also acted as a secretary. Ormond Dep. at 40:24-41:9. Mr. Ormond asked Mr. Bixler to make an "initial draft of the issues that were discussed by the Committee and the

19

Committee's conclusion." Defs.' 56.1(a)(3) St. ¶ 56. Mr. Bixler also "provided answers to questions and some points of clarification. He was not a major player in the discussion." Edwards Dep. at 67:10-21; Ormond Dep. at 70:17-72:7, 74:11-75:20. Mr. Bixler did not advocate that the Committee make any particular decision nor did he recommend that the Committee grant or deny Plaintiff's claim. Ormond Dec. ¶ 8; O'Brien Dec. ¶ 11; Bixler Dec. ¶ 12.

At the conclusion of the meeting, Mr. Ormond, Mr. Meyers, Mr. O'Brien, and Ms. Edwards voted to deny Plaintiff's claim. Defs.' 56.1(a)(3) St. ¶ 53; Pl.'s 56.1(b)(3) St. ¶ 53. Therefore, based on the record, the court finds that it was the Committee members and, not Mr. Bixler, who made the determination regarding Plaintiff's claim for benefits. Rather, Mr. Bixler merely attended the meeting in his legal role as counsel to the Committee.

**D.** **Plaintiff Has Not Identified Any Procedural Defect In The Claims Process Under The Plan That Warrants Heightened Scrutiny Of The Committee's Decision.**

Plaintiff claims that there were a myriad of procedural errors that warrants heightened scrutiny of the Committee's decision to deny her claim. Pl.'s Mem. at 10, 12-13. Defendant, on the other hand, argues that the Committee substantially complied with all applicable ERISA regulations; therefore, heightened scrutiny of the Committee's decision is not appropriate. Defs.' Mem. at 15.

Under Seventh Circuit law, if significant procedural errors exist, the appropriate remedy is to remand the case to the plan administrator to remedy the defects. *Schleibaum v. Kmart Corp.,* 153 F.3d 496, 503 (7th Cir. 1998). The standard for reviewing the administrator's decision, however, is not altered. *Id.* Moreover, not all procedural defects require a remand and substantial compliance with the regulations is sufficient. *Brown v. Retirement Comm. of Briggs & Stratton Retirement Plan,* 797 F.2d 521, 536 (7th Cir. 1986).

1. **Under The Applicable Regulations, The Committee Had No Obligation To Provide Plaintiff With A Copy Of The Plan.**

Plaintiff asserts that the Committee failed to give her a copy of the Plan. Pl.'s Mem. at 13. Plaintiff, however, admits that before she resigned from her position she had a copy of the Plan. Dabertin Dep. at 37:9-46:18. She also knew that she was entitled to severance benefits under the Plan if she met the eligibility criteria. *Id.* Moreover, Plaintiff's letters seeking benefits under the Plan referenced and quoted specific sections of the Plan. *See e.g.,* Ltr. Fr. J. Dabertin to K.Weikel dated Oct. 21, 1998; Ltr. fr. J. Dabertin to K.Weikel dated Oct. 21, 1998; Ltr. fr. M. Denis to Committee dated Jan. 12, 1999.

The court finds that under the applicable ERISA regulations, Defendants did not have a duty to provide her with a copy of the Plan. 29 C.F.R. § 2520.104-24(b)-(c); Defs.' Mem. at 21. However, as demonstrated by record evidence Plaintiff did have a copy of the Plan and was aware of benefits available under the Plan.

2. **Plaintiff Received Full And Fair Review Of Her Claim.**

Plaintiff next claims that she did not receive a full and fair review of her claim as set forth in ERISA, 29 U.S.C. § 1133. Pl.'s Mem. at 12-13.

ERISA contemplates a two-part decision-making process which includes an initial decision and a review of that decision by the plan administrator. *Brown,* 797 F.2d at 534. "The persistent core requirements of review intended to be full and fair include knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Id.*

Plaintiff claims that she did not receive a full and fair review because Mr. Weikel's initial notice in which he denied her claim for benefits did not identify additional information that she needed to provide to perfect her claim. Pl.'s Mem. at 13 & n.28. Where additional information is unnecessary to perfect a claim, the initial reviewer need not ask the claimant to provide such information. *Brown*, 797 F.2d at 536. The court finds that because Mr. Weikel did not dispute Plaintiff's factual allegations, he had no reason to ask her to supplement the record. Rather, Mr. Weikel merely disagreed with her application of the Plan to those facts.

The purpose of the initial denial notice is to enable the claimant to "adequately prepare . . . for any further administrative review." *Matuszak v. Torrington Co.*, 927 F.2d 320, 323 (7th Cir. 1991) (quotation omitted.) The court finds that Mr. Weikel's letter was sufficient to alert Plaintiff to any deficiencies in the record because her attorney was able to compile a comprehensive, twenty-two page letter detailing her objections to Mr. Weikel's denial. *See Brown*, 797 F.2d at 536 (initial denial letter substantially complied with requirements where claimant was able to prepare submission objecting to denial); *see also Bussey v. Corning Life Servs., Inc.*, 2000 WL 91916, at *6 (N.D. Ill. Jan. 19, 2000) (initial denial notice that did not request additional information did not deprive claimant of full and fair review).

Plaintiff next asserts that the Committee denied her full and fair review when it refused to tell her what evidence it would rely upon in deciding her claim before it issued its written decision. Pl.s' Mem. at 13. Plaintiff's claim is unavailing because the Committee would not know in advance the evidence upon which it would rely before it reached its decision.

Plaintiff also claims that she should have been allowed to attend the Committee's January 14, 1999 meeting. Pl.'s Mem. at 13. The court, however, finds that ERISA does not require that a

claimant be allowed to appear before the Committee.[6] *Brown,* 797 F.2d at 534.

Finally, Plaintiff claims that the Committee members should have identified themselves. For instance, Plaintiff claims that "[a]bsent knowledge of who was on the Committee, [she] could not fairly formulate her written submissions." Pl.'s Mem. at 13. The court finds Plaintiff's argument unavailing because she has failed to cite ERISA regulations that require this type of identification when the Plan is not subject to ERISA's disclosure requirements. 29 C.F.R. § 2520.104-24(b)-(c). Moreover, Plaintiff has not identified anything she would have added to her submissions if she had known the Committee's identity.

Accordingly, the court finds that because the "core requirements" have been satisfied, Plaintiff received a full and fair review of her claim.

### 3. The Committee Met The Deadline For Deciding Plaintiff's Claim.

Plaintiff asserts that the Committee failed to decide her claim within a sixty-day time period, as required by the Plan. Pl.'s Mem. at 10.

Plaintiff submitted her appeal on November 18, 1998, which meant that the Committee was required to reach its decision by January 17, 1999 (sixty-day time period). Ormond Dec. ¶ 11; O'Brien Dec. ¶ 9. January 17, 1999, however, was a Sunday and the next day, January 18, 1999, was a federal holiday (Martin Luther King Jr.'s Birthday). *Id.* The Plan was silent about whether a Sunday or legal holiday should be included as the last day of the sixty-day period. *Id.* In exercising its discretion to supply omissions, the Committee determined that a Sunday or legal holiday would not count as the last day of the sixty-day period. *Id.* The Committee decided that the sixty-day period would end on January 19, 1999.

---

[6]Plaintiff claims that the Committee should have allowed her to appear because Mr. Bixler was representing Manor Care and HCR Manor Care during the Committee meeting. To the contrary, it is undisputed that Mr. Bixler attended the meeting in his capacity as "legal advisor to the Committee." Meyers Dep. at 32:12-15; *see also* O'Brien Dep. at 27:3-7.

The court finds that the Committee clearly had discretion to interpret the Plan and extend the sixty-day period to accommodate the federal holiday. Moreover, a plan administrator substantially complies with the deadline for issuing a decision even if it issues the decision several days after the deadline passes. *See Bussey,* 2000 WL 91916, at *4. Therefore, the Committee substantially complied with the Plan's requirements because it provided Plaintiff with its decision within sixty-one days from the time she filed her appeal.[7]

Accordingly, the court, finds that Plaintiff's claim that Defendants' procedural errors warrant heightened scrutiny of the Committee's decision is unavailing. The court holds that the Defendants substantially complied with all procedural regulations and that remanding the cause to the plan administrator is not required.

**E.  Plaintiff Has Not Shown That The Committee Treated Her As An Adversary.**

Plaintiff next claims that the Committee had a conflict of interest because its members "improperly acted as 'advocates or adversaries.'" Pl.'s Mem. at 12.

An ERISA fiduciary "must act as though it were a reasonably prudent businessperson with the interests of all the beneficiaries at heart." *Ameritech Benefit Plan Comm. v. Comm. Workers of Am.,* 220 F.3d 814, 825 (7th Cir. 2000). However, this duty "cannot mean that it must cater to the optimal needs of each individual beneficiary." *Id.*

The record demonstrates that the Committee members understood that they had a duty to act in the best interests of all Plan participants:

Q.  What did you understand your general responsibilities [as a Committee member] to be?

A.  Well, I understood that my general responsibility as a member of the Committee was

---

[7] On January 18, 1999, the Committee faxed Plaintiff a copy of the minutes delineating its decision and on January 19, 1999, a copy was also mailed to her. Ormond Dec. ¶ 12; O'Brien Dec. ¶ 9.

to the participants in the Plan.

Ormond Dep. at 75:21-76:10; *see also* O'Brien Dep. at 58:17-59:7 (same). Therefore, because the record demonstrates that the Committee members knew that they had a duty to act in the interests of all beneficiaries, the court finds Plaintiff's argument unavailing. Moreover, Plaintiff has offered no evidence to support her claim.

**F.      Defendants Are Not Estopped From Claiming That The Committee Is The Plan Administrator.**

Plaintiff argues that Defendants are estopped from claiming that the Committee was the Plan Administrator. Pl.'s Mem. at 12. Plaintiff claims that her attorney, Mr. Denis, asked Mr. Bixler if there was a Plan Administrator and Mr. Bixler stated in writing that there was no Plan Administrator. *Id.*

Under ERISA, estoppel consists of "(1) a knowing misrepresentation; (2) made in writing; (3) with reasonable reliance on that misrepresentation by the plaintiff; (4) to [his] detriment." *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir. 1999). In the case at bar, Plaintiff cannot show that Mr. Bixler knowingly misrepresented facts to her. During Mr. Bixler's deposition, he testified that he interpreted Mr. Denis' question regarding whether there was a Plan Administrator as "asking whether there's a separate plan administrator, like some benefits company or something like that was administering the plan . . . So I said no, there was no capital P plan capital A administrator, the committee was administering the plan." Bixler Dep. at 60:18-61:3.

The court, therefore, finds that the doctrine of estoppel is not applicable because Mr. Bixler did not make a knowing misrepresentation upon which Plaintiff detrimentally relied. Rather, there was simply a mis-communication between Mr. Bixler and Mr. Denis. Moreover, the Plan clearly indicates that the Committee is the Plan Administrator (Plan § 5.1) and Plaintiff continued to send letters to the Committee which indicated that she knew it was the plan administrator.

Therefore, based on the foregoing discussion, the court finds that the applicable standard of review is the arbitrary and capricious standard. Plaintiff's allegations regarding conflicts of interest and/or bias towards her on the part of the Committee are unavailing and accordingly, do not warrant *de novo* review of the Committee's decision by the court.

## IV.     THE WRONGFUL DENIAL OF BENEFITS UNDER ERISA CLAIMS(S).

In Count I (and part of Count III), Plaintiff argues that even if *de novo* review is not warranted, the Committee's decision to deny Plaintiff's claim under the Plan was clearly arbitrary and capricious. Pl.'s Mem. at 14. Defendants, on the other hand, allege that the Committee's decision to deny Plaintiff's claim was not arbitrary and was based on the Plan provisions. Defs.' Reply at 20.

Under the arbitrary and capricious standard, the court can only review a committee's interpretation of a plan, not the plan language. *Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 898 (7th Cir.) The court may not interfere with the plan administrator's interpretation or decision unless he "not only made the wrong call, but a . . . 'downright unreasonable' one." *James*, 230 F.3d at 317 (quotation omitted.) In other words, a court must uphold a decision so long as that decision is based on a reasonable interpretation of the plan's language and the evidence in the case. *Daill v. Sheet Metal Workers' Local 73*, 100 F.3d 62, 68 (7th Cir. 1996). "All questions of judgment are left to the plan, and a court must be very confident that the plan overlooked something important or seriously erred in appreciating the significance of the evidence to overturn the plan's determination." *Kubica v. Washington Nat'l Ins. Co.*, 2000 WL 1231554, at *4 (N.D. Ill. Aug. 28, 2000). It does not matter whether the result reached by the administrator is one we would have arrived at in the first instance. *Ladd v. ITT Corp.*, 148 F.3d 753 (7th Cir. 1998). "In other words, it is hard to overturn a decision of a plan administrator." *James*, 230 F.3d at 317.

**A.** **A Genuine Issue Of Material Fact Exists As To Whether The Committee's Decision That Plaintiff Did Not Suffer A Significant Reduction In The Scope of Her Authority, Position, Title, Functions, Duties, Or Responsibilities Was Arbitrary and Capricious.**

Plaintiff claims, initially, that "[h]er title was axed in half" because she had been the Vice-President/General Manager for the Central and Western Divisions before the merger and she only retained the Vice-President/General Manager position for the Western Division after the merger. Pl.'s Mem. at 17. Plaintiff, thus, asserts that under the Plan, she was entitled to severance benefits if she experienced "a significant reduction in the scope of [her] authority, position, title, functions, duties, or responsibilities." Plan. § 1.8(i).

Defendants assert that the Committee was not downright unreasonable in determining that Plaintiff did not experience a significant reduction in the "scope" of her position or title after the merger. For example, Plaintiff retained her position and title as a board-elected Vice-President/General Manager of Manor Care and received the additional position and title of a board-elected officer of HCR Manor Care. Defs.' 56.1(a)(3) St. ¶ 30; Pl.'s 56.1(b)(3) St. ¶ 30. Moreover, Plaintiff's additional title and position as a board-elected officer of HCR Manor Care and her enhanced position as a board-elected officer of Manor Care, which had nearly doubled in size, led to an increase in the scope of her title and position rather than a "significant reduction."[8]

The Committee considered Plaintiff's twenty-two page submission in which she compared her duties, responsibilities, functions, and authority before and after the merger. *See* Ltr. fr. M. Denis to Committee dated Jan. 12, 1999. The gravamen of Plaintiff's Committee submission was that after

---

[8]Plaintiff claims that the finding that "she received the additional title and position of board-elected officer of HCR Manor Care" is "absent in the Decision." Pl.'s Mem. at 10 & n.19. However, on the first page of the decision, the Committee notes that Plaintiff is an officer of HCR Manor Care. Decision of Committee Re: Claim of Judy Dabertin at 1. The decision also notes that as to Manor Care, Plaintiff "has remained a Board elected DVP/GM, reporting to the Chief Operating Officer of an organization which is now approximately twice as large as her previous employer." *Id.* at 3-4.

the merger, she was assigned only the Western Division whereas before the merger she had been assigned both the Central and Western Divisions. *Id.* Plaintiff claims that she lost the duties, responsibilities, functions, and authority connected with the Central Division, although she acknowledged that she continued to have the same duties, responsibilities, functions, and authority connected with the Western Division. *Id.*

In its considering Plaintiff's claim that she had a significant reduction in the scope of her authority, functions, duties, and responsibilities, the Committee accepted her assertion that Manor Care had reduced the size of the business unit that she managed. Defs.' 56.1(a)(3) St. ¶ 66; Defs.' Mem. at 19. Interpreting the Plan, the Committee in its decision, herein, determined that "if a Participant continues to have a full range of operational, financial, administrative and other authority, functions, duties and responsibilities with respect to the business unit the Participant manages, the scope of the Participant's authority, duties, functions and responsibilities would not be affected." *Id.* (emphasis in original). In applying this provision, the Committee found that although "the business unit [Plaintiff] continued to manage [was somewhat smaller in terms of facilities, beds and budget], Plaintiff still had a full scope of financial, operational, administrative and strategic authority, functions, duties and responsibilities" for that business unit. *Id.* Thus, the Committee interpreted the Plan term "scope" *inter alia* to mean that if Plaintiff had ten duties, responsibilities, and functions before the merger and had the same ten duties, responsibilities, and functions after the merger, she would not suffer a significant reduction in the scope of her duties, responsibilities, or functions.

In addition, the Committee found that Plaintiff's duties, responsibilities, functions and authority intensified after the merger. Defs.' Reply at 21. As the Committee explained, "DVP/GMs were required to focus more intensively on the day-to-day operations of the centers in their respective

divisions . . . [by] spend[ing] significantly more time in the facilities in their divisions, . . .
conduct[ing] operations reviews with the Regional Directors of Operations . . . every month on every
center, . . . be[ing] more involved in the day-to-day oversight of the centers in the areas of care,
staffing levels, accounts receivables, workers compensation and agency utilization."[9]  Decision of
Committee Re: Claim of Judy Dabertin at 4.  Accordingly, the Committee found that Plaintiff's job
got harder after the merger and consequently, she did not experience a significant reduction in the
scope of her authority, functions, duties, or responsibilities that would give her "Good Reason" to
resign from her position.[10]

Plaintiff's further claims that she suffered a significant reduction in the *scope* of her
authority, position, title, functions, duties, or responsibilities because her independent capital project
spending authority was eliminated (it had been pre-merger $50,000 per project per year, up to an

---

[9]Plaintiff complains that she lost cluster market functions (Pl.'s Mem. at 20), but she
admits that it would have been impossible for her to perform these functions as well as her newly
intensified duties, responsibilities, functions, and authority. Dabertin Dep. at 204:11-24.

[10]Plaintiff argues that prior to the merger she had responsibility for 50 construction
projects, but that, post merger, "all Western Division construction projects were frozen." (Pl.'s
Mem. at 20; Pl.'s Reply at 8.)  Defendants contend, however, as follows: Plaintiff did not
respond to Defendants' showing that the freeze did not result in the reduction of the *scope* of her
duties, responsibilities, functions, or authority.  In light of the deteriorating performance of
facilities in the Western Division, Defendants assert, Manor Care decided to focus on the
performance of its existing facilities and froze its construction projects in the Western Division.
Ormond Dep. at 23:9-24.  Plaintiff continued to be assigned all of the same duties, functions,
responsibilities, and authority for construction, although she spent much less time working on
construction after the merger.  Weikel Dec. ¶ 14; Weikel Dep. at 30:13-23.  Instead, Mr. Weikel
required that Plaintiff focus on her duties, responsibilities, functions, and authority for
profitability and performance of existing facilities.  Weikel Dec. ¶ 14.

Defendants continue that Plaintiff's claim that after the merger, she was no longer
assigned the same duties, functions, responsibilities, and authority for construction is based
solely on the fact that she spent little or no time working on construction issues.  Plaintiff,
however, has acknowledged, Defendants state, that the mere fact that she was not then
performing a particular duty, responsibility, or function did not mean that she was no longer
assigned that particular duty, responsibility, or function. Dabertin Dep. at 197:11-18.  Plaintiff,
Defendants allege, has no evidence that she would not have resumed her duties, functions,
responsibilities and authority for construction if the freeze were lifted.

aggregate amount of $150,000 per year, plus $6 million that was already budgeted). Pl.'s Reply at 8. Plaintiff maintains, too, that the fact that she lost hiring and firing authority over ten regional managers in the Lombard, Illinois office constituted a significant reduction in the *scope* of her authority, position, title, functions, duties, or responsibilities. *Id.*

The court finds that given the Plaintiff's loss of position and title as to the Central Division after the merger, as well as her loss of independent capital spending authority, loss of hiring and firing authority over ten Lombard regional managers, loss of cluster market functions, and the Defendants' freezing of construction projects, a genuine issue of material fact(s) exists as to whether the Committee's determination that Plaintiff did not suffer a significant reduction in the scope of her authority, position, title, functions, duties or responsibilities was arbitrary and capricious (i.e., downright unreasonable). *See Bowles v. Quantum Chem. Co.*, 266 F.3d 622 (7th Cir. 2001).

Accordingly, Defendants' Motion for Summary Judgment is denied as to Count I and insofar as the aforedescribed issue is alleged in and contained in Count III of the Second Amended Complaint.

**B.      The Committee Did Not Arbitrarily Reject Plaintiff's Constructive Discharge Claim.**

Plaintiff alleges in her motion for summary judgment that she was constructively discharged. Pl.'s Mem. at 22-23. Defendants, on the other hand, assert that Plaintiff was not constructively discharged because Plaintiff continued to receive her salary, retained her position as Vice-President/General Manager of Manor Care and had the same scope of duties, authority, responsibilities, and functions in the Western Division that she had been assigned before the merger. Defs.' Reply at 22. In addition, these duties, authority, responsibilities, and functions intensified with the new requirement that Plaintiff become more involved in the day-to-day oversight of these facilities. *Id.* The Committee, therefore, acted reasonably in rejecting Plaintiff's constructive

discharge claim. *Id.*

The court agrees with the Defendants and finds that there is no genuine issue of material fact with respect to Plaintiff's constructive discharge claim.

**C.     Plaintiff Has Not Shown That Any Change In The Bonus Program Adversely Affected Her.**

Plaintiff claims in her summary judgment motion that there was a significant change in Manor Care's annual bonus program that adversely affected her. Pl.'s Mem. at 22. Defendants, on the other hand, assert that Manor Care's bonus program changed after Plaintiff resigned so any change in the program did not adversely affect her.   Defs.' Reply at 23.

Under the Plan, a participant was entitled to severance benefits if there was "a significant change in the Company's annual bonus program adversely affecting the Participant." Plan § 1.8(iv). The Committee accepted as true Plaintiff's claim that Manor Care changed her bonus entitlement from a target of 43% of her base salary (up to a maximum of 65%) to a target of 30% of her base salary (up to a maximum of 45%). Decision of Committee Re: Claim of Judy Dabertin at 3. However, in reviewing Plaintiff's claim, the Committee found that any change in the bonus program did not adversely affect Plaintiff because she only received a 14% bonus under the Fiscal Year 1998 Program. Defs.' 56.1(a)(3) St. ¶ 71; Pl.'s 56.1(b)(3) St. ¶ 71. Moreover, the Committee found that a 14% bonus was far below both the 30% target and 45% maximum forecasted for the post-merger bonus program.

The court finds that there is no genuine issue of material fact with respect to Plaintiff's allegation regarding the annual bonus program because Manor Care's change in target percentages was not significant to Plaintiff because she did not come close to earning a 30% bonus, let alone a 45% bonus in Fiscal Year 1998 Program.  In addition, as Plaintiff concedes, Manor Care's bonus

program did not change until after she had resigned from her position.[11]  Therefore, because the change in the program did not adversely affect Plaintiff, the Committee's determination cannot be viewed as being either arbitrary or capricious.

### D. The Committee's Decision that Plaintiff Did Not Suffer A Significant Reduction In The Employee Benefit Stock Option Eligibility Was Not Downright Unreasonable.

Plaintiff claims in her motion that she suffered a significant reduction in employee benefits. Pl.'s Mem. at 22. Plaintiff points out that Manor Care awarded her a stock option grant of 25,000 shares after the merger and told her not to expect another grant for two years. *Id.* Plaintiff claims, however, that in the past, she received stock option grants averaging 18,000 shares each year. *Id.* Moreover, Plaintiff asserts that when she resigned from her position, she was still eligible to receive stock options grants when Manor Care awarded them. Defendant, however, argues that Plaintiff did suffer a reduction in stock option grants because these grants were not employee entitlements. Defs.' Reply at 24.

Under the Plan, a participant was entitled to severance benefits if there was "a significant reduction . . . in employee benefits provided to a Participant." Plan § 1.8(v). The record demonstrates that Plaintiff was entitled to receive stock option grants only when Manor Care made the decision to award such grants. Defs.' 56.1(a)(3) St. ¶ 72; Pl.'s 56.1(a)(3) St. ¶ 72. Moreover, Plaintiff was aware of the fact that she was not entitled to receive annual stock options unless Manor Care, in it's discretion, elected to award stock option grants to its employees. Defs.' 56.1(a)(3) St. ¶ 74. Accordingly, the court finds that the Committee did not act unreasonably when it decided that

---

[11]The bonus plan had not changed when Plaintiff resigned from her position. As Plaintiff admits, the Manor Care Fiscal Year 1999 bonus plan had a target of 43% and a maximum of 65%. Dabertin Dep. at 224:4-8. This bonus plan was still in effect on October 21, 1998 when Plaintiff resigned. *Id.* at 224:9-12. By Plaintiff's own admission, there had been no change in Manor Care's bonus program when she resigned. The Committee, however, treated Plaintiff's factually inaccurate claim as true and evaluated it.

Plaintiff had not suffered a significant reduction in stock option grant eligibility.

### E. The Committee Did Not Decide Plaintiff's Claim Arbitrarily.

In her summary judgment motion, Plaintiff makes certain other assertions, as to her contention that the Committee decided her claim in an arbitrary and capricious manner, that will be herein addressed.

### 1. The Committee Did Not Rely On Facts Outside The Record.

Plaintiff alleges that the Committee improperly relied on "multiple facts that were not in the record." Pl.'s Mem. at 16. Plaintiff asserts that the only facts before the Committee were contained in her letters. *Id.*

While the administrative record is "limited to the information submitted to the plan's administrator" (*Perlman*, 195 F.3d at 982), there is no reason why the Committee members cannot orally supply information to the Committee.[12] The record demonstrates that the Committee members, who were also officers of Manor Care, had independent knowledge of Plaintiff's position and contributed their knowledge to the decision. For instance, Mr. Wade O'Brien was Manor Care's Vice-President of Human Resources and Labor Relations and as such, he knew about Plaintiff's employee benefits. O'Brien Dep. at 7:11-16. Mr. Ormond was the President and Chief Executive Officer of Manor Care. Ormond Dec. ¶ 1. He helped develop the post-merger duties of the Vice-President/General Managers and instructed "all the general managers. . .[on] what their responsibilities, duties and priorities were going to be in the postmerger meetings." Ormond Dep. at 27:4-28:26. In addition, Ms. Nancy Edwards was the Vice-President/General Manager for the Central Division and understood the requirements of that job. Edwards Dep. at 7:23-8:1.

---

[12]In any event, the remedy when a plan administrator "fails to make adequate findings or to explain its grounds adequately is to send the case back to the tribunal for further findings or explanation." *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996).

The court finds that the fact that the Committee considered evidence in addition to what Plaintiff presented in her letters did not render the Committee's decision as one that could be considered to be arbitrary and capricious. Rather, the additional facts and information provided by the various company officials were needed to clarify or supplement the record in order to make an informed decision regarding Plaintiff's claim.

### 2. The Committee Investigated Plaintiff's Claim.

Plaintiff asserts that the Committee did not investigate her claim and "den[ied] it without obtaining the relevant information." Pl.'s Mem. at 23. Plaintiff alleges that no inquiry was made about Plaintiff's pre-merger title, position and functions; therefore, the Committee's denial of Plaintiff's claim without obtaining the relevant information is arbitrary. *Id.*

The court finds that based on the record that the Committee not only investigated Plaintiff's claim, but that it obtained and considered all relevant information. The Committee considered Plaintiff's twenty-two page submission comparing her position as Vice-President/General Manager before and after the merger. In addition, the relevant information available through company officials was also considered by the Committee. Therefore, the court finds that the Committee did, in fact, investigate Plaintiff's claim by considering all relevant information; therefore, it's decision to deny her benefits under the Plan was not arbitrary.

### 3. The Committee Considered The Important Aspects Of Plaintiff's Claim.

Plaintiff asserts that the Committee should have addressed "the elimination of the 401(k) benefit[] and the stock purchase plan." Pl.'s Mem. at 24. The court finds, however, that these benefits had not been eliminated at the time Plaintiff resigned from her position. Dabertin Dep. at 215:19-23; Changes to Employee Stock Purchase Plan (Defs.' 56.1(b)(3) St. Ex. 15). Under the Plan, Plaintiff was entitled to benefits only if she had "Good Reason" to terminate her job. Plan art. III.

Therefore, events that occurred after her resignation are irrelevant to her claim. *Chojnacki*, 108 F.3d at 816 (plan promised severance benefits to employers who "experience[d] a material reduction in . . . benefits;" plaintiffs who "anticipated a reduction in benefits" but retired before the reduction occurred were not entitled to benefits under the plan). Therefore, the court finds Plaintiff's argument unavailing in that the Committee did not act in an arbitrary and capricious manner by not addressing the 401(k) benefit and stock purchase plan.

### 4. Defendants Have Not Offered Inconsistent Reasons For Denying Benefits.

Plaintiff alleges that Defendants have given inconsistent reasons for denying her claim. Pl.'s Mem. at 24. For example, Plaintiff alleges that Defendants' internal documents contradict the reason Plaintiff's severance pay was denied in that their documents state that the denial was due to the fact that her resignation was "unapproved." *Id.*

The record demonstrates that Mr. Weikel denied Plaintiff's claim for benefits because she did not have "Good Reason" as stipulated under the Plan to terminate her position. Defs.' 56.1(a)(3) St. ¶ 43; Pl.'s 56.1(b)(3) St. ¶ 43. On December 14, 1998, Mr. Greg Siegrist, a Manor Care employee who was processing severance benefits, sent an e-mail message to Manor Care's health insurance provider, stating that Plaintiff had "been removed from the list of people who get special benefits due to [her] 'unapproved' resignation." E-mail fr. G. Siegrist to A.Kost dated Dec. 14, 1998 (Defs.' 56.1(b)(3) St. Ex. 18). Here, Mr. Siegrist was simply informing the insurance provider that Plaintiff no longer qualified for benefits under the Plan. O'Brien Dep. at 126:3-12. The court finds Plaintiff's assertion unavailing because there is nothing inconsistent between Mr. Weikel's statement denying Plaintiff benefits because she did not resign for "Good Reason" and Mr. Siegrist statement that Plaintiff should not receive benefits due to her "unapproved" resignation.

### 5. Defendants Are Not Estopped From Denying Plaintiff Benefits Under The Plan.

Plaintiff alleges that Defendants are estopped from denying her severance benefits because Mr. Don Tomasso, the former President of Manor Care, and Mr. Scott Van Hove, the former Chief Operating Officer of Manor Care, told her that "changes [in her job] constituted 'good reason.'" Pl.'s Mem. at 25.

Plaintiff must establish that Defendants made a knowing representative in writing upon which she reasonably relied. *Coker*, 165 F.3d at 585. Here, the court first finds that the alleged representations by Mr. Tomasso and Mr. Van Hove were oral; rather, than in writing. Moreover, Plaintiff testified that when Mr. Tomasso and Mr. Van Hove allegedly made these statements, she did not believe that they would have any involvement in deciding any claim that she might have under the Plan. Dabertin Dep. at 50:21-51:5, 66:15-18.

In *Gall v. Liberty Mut. Ins. Group*, 2001 WL 290194, at *6 (N.D. Ill. Mar.16, 2001), Judge Castillo rejected a similar estoppel claim. In that case, plaintiff Margaret Gall claimed that she relied to her detriment on verbal advice from Nancy Miller, a Human Resources Manager, that she would be eligible for severance benefits under an ERISA plan. *Id.* Judge Castillo held that the plan was not estopped from denying severance benefits to Ms. Gall. *Id.* He reasoned that her "reliance on a telephone conversation with Miller who did not have decision-making authority and who did not provide anything in writing to Gall, was misplaced." *Id.*

The court finds Plaintiff's estoppel argument unavailing. Here, as in *Gall*, Plaintiff's reliance on Mr. Tomasso and Mr. Van Hove's, statements was misplaced because they were former company officials who had no decision-making authority and the statements were not in writing. Moreover, Plaintiff acknowledged that she did not think that Mr. Tomasso and Mr. Van Hove had any involvement in deciding her claim. Therefore, Plaintiff could not have reasonably relied on their statements.

## V.  MANOR CARE DID NOT BREACH ITS DISCLOSURE REQUIREMENTS UNDER ERISA.

In Count II, Plaintiff alleges that Manor Care failed to comply with Section 104(b)(4) of ERISA by not providing her with, *inter alia*, a copy of the Plan, a summary plan description and other relevant documents relating to the Plan. 2d. Am. Cmplt ¶¶ 78-83.  Defendants, on the other hand, assert that the Plan is exempted from ERISA's disclosure requirements. Defs.' Mem. at 21.

Section 104(a)(3) of ERISA provides that "the Secretary may by regulation exempt any welfare benefit plan from all or part of the reporting and disclosure requirements of this subchapter [Part 1 of Title 1 of ERISA] . . .." 29 U.S.C. § 1024(a)(3).  Pursuant to this grant of authority, the Secretary of Labor has "exempt[ed] [plans] from the reporting and disclosure provisions of Part 1 of Title 1 of the Act [ERISA]" if the plans are: (1) "maintained by an employer primarily for the purpose of providing benefits for a select group of management or highly compensated employees" and (2) the "benefits [under the plans] . . . are paid as needed solely from the general assets of the employer." 29 C.F.R. § 2520.104-24(b)-(c).

The court finds that the Plan meets both of these requirements.  The Plan was maintained by Manor Care to provide benefits for highly compensated management employees and the benefits were paid out of Manor Care's general assets. Defs.' 56.1(a)(3) St. ¶¶ 8,19.  Therefore, the court finds that there is no genuine issue of material fact with respect to Defendants' failure to disclose plan documents because under ERISA requirements, there is no duty to provide said documents.

## VI.  MANOR CARE DID NOT BREACH ITS FIDUCIARY DUTY UNDER ERISA.

In Count III, Plaintiff alleges that Manor Care breached its fiduciary duties pursuant to 29 U.S.C. § 1132(a)(2) and (3) by refusing to pay her benefits, failing to comply with ERISA's procedural requirements, and refusing to disclose documents under which the Plan is established. 2nd Am. Cmplt. ¶¶ 84-92.  As already discussed, the court has determined that there is a genuine issue

of material fact regarding the portion of Count III that can be construed as encompassing a wrongful denial of benefits claim. (*See*, p. 30, *supra*.) With respect to the other matters alleged in Count III: first, the court has already determined that Manor Care has no duty to disclose documents to Plaintiff because it is exempt under applicable ERISA provisions; therefore, there is no genuine issue of material fact with respect to whether Manor Care complied with ERISA's procedural requirements.

Secondly, Plaintiff further alleges that Manor Care breached its fiduciary duty by failing to inform her that it was negotiating "to sell one-third of the West Division properties." Pl.'s Mem. at 26. The court finds Plaintiff's argument to be unavailing because an ERISA fiduciary has "no duty to provide individualized notice of the effect a particular event may have on a participant . . ." *Childers v. Northwest Airlines, Inc.* 688 F.Supp 1357, 1361 (D. Minn. 1988). In addition, Mr. Weikel could not have told Plaintiff about the sale before she resigned from her position because the sale of the West Division properties had not yet been proposed. The first discussion regarding the sale of these properties occurred in late November, 1998 which was more than a month after Plaintiff left Manor Care. Ormond Dep. at 20:20-21:16. Prior to that meeting, Manor Care had not sought buyers for its West Coast properties and had no plans to sell them. *Id.* at 22:15-18; *see also* Weikel Dep. at 41:2-14. Therefore, the court finds that Defendants did not owe Plaintiff a duty to inform her of its intent to sell the Western properties and, moreover, Plaintiff had already resigned from her position.

Plaintiff also asserts that the Committee had a duty to disclose that Ms. Tal Widdes and Mr. Ed Kubis were initially denied severance benefits under the Plan. Pl.'s Mem. at 26. The record, however, demonstrates that these claims were decided by Ms. Widdes's and Mr. Kubis's supervisors, who were different from Plaintiff's supervisor. Weikel Dep. at 11:10-21; Bixler Dep. at 21:8-15. Ms. Widdes's and Mr. Kubis's supervisors were not Committee members. Neither Ms. Widdes nor

Mr. Kubis appealed their denials to the Committee, and, as a result, the Committee never decided their claims.[13] The court finds that there is no genuine issue of material fact regarding whether the Committee had a duty to disclose these claims.

Therefore, the court finds that, apart from the wrongful denial of benefits allegation, there is no genuine issue of material fact, and Defendants are entitled to summary judgment, with respect to Count III.

## VII. PLAINTIFF'S BREACH OF CONTRACT AND ILLINOIS STATUTORY CLAIMS ARE PREEMPTED UNDER ERISA.

In Counts IV and V, Plaintiff alleges breach of contract and Illinois Wage Payment and Collection Act claims. 2nd Am. Cmplt. ¶¶ 93-110.

ERISA preempts any state law claim that "relate[s] to . . . employee benefit plan[s]. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Moreover, the Seventh Circuit has consistently declined to consider state law claims where the claims arose from employee benefit plans governed by ERISA. *Miller v. Taylor Insulation Co.*, 39 F.3d 755, 757-58 (7th Cir. 1994) *citing* 29 U.S.C. § 1144(a)); *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1136-37 (7th Cir. 1992). Moreover, ERISA preempts a state law claim if the claim requires the court to interpret or apply the terms of an employee benefit plan. *Fort Halifax*, 482 U.S. at 11, 107 S.Ct. 2211, 96 L.Ed.2d 1.

Because the court has determined that ERISA is applicable in this cause, Plaintiff's state law claims are preempted in that they arose from the Plan and would require the court to interpret the

---

[13]Ms. Widdes's and Mr. Kubis's claims were materially different from Plaintiff's claim. *See, e.g.*, O'Brian Dep. at 143:13-144:5 (after a series of strategic discussions about the Alzheimer's product area, Manor Care determined that it "didn't really have a need for [Tal Widdes's] services"); Bixler Dep. at 19:20-20:5 (HCR Manor Care "did not have a full-time job for Ed Kubis").

terms of the Plan.[14]  Therefore, the court finds that there is no genuine issue of material fact, and

Defendants are entitled to summary judgment as a matter of law, with respect to Counts IV and V

because Plaintiff's state law claims are preempted under ERISA.

## VIII.    PLAINTIFF CANNOT RECOVER HER *PRO RATA* BONUS CLAIMS.

In Counts VI and VII, Plaintiff alleges breach of contract and violation of Illinois Wage

Payment and Collection Act claims in that she is entitled to recover a *pro rata* bonus.  Pl.'s Mem.

at 28.  As a threshold matter, the court finds that these claims are not preempted by state law because

they are not predicated on the Plan.  (*See* Pl.'s 56.1(a)(3) St. (*cf.*) ¶¶ 213, 225.)

Plaintiff claims that after she resigned from her position, on October 12, 1998, Manor Care

circulated an e-mail message offering to pay a "stub-year" or *pro rata* bonus to "all bonus-eligible

pre-merger Manor Care employees."  E-mail fr. N. Parker dated Nov. 25, 1998 (Defs.' 56.1(b)(3)

St. Ex. 16.)  To be eligible for a bonus under Manor Care's Fiscal Year 1999 Plan, an employee had

to be employed at Manor Care on the date of the payout.  Manor Care, Inc. FY '99 Executive Cash

Incentive Plan Document § VII(A) (Defs.' 56.1(b)(3) St. Ex. 17).  The court finds Plaintiff's claim

that she is entitled to a *pro rata* bonus unavailing because she resigned on October 12, 1998, which

was well prior to the time that Manor Care even offered a *pro rata* bonus to its employees.  Thus,

Manor Care never promised Plaintiff any type of *pro rata* bonus and her claim of promissory

estoppel fails.  In any event, Plaintiff did not meet the condition essential to bonus eligibility, that

she be employed at Manor Care on the date of the payout.

Plaintiff, however, asserts that she did not have to meet the condition precedent that she was

employed on the date of the payout by relying on *Camillo v. Wal-Mart Stores, Inc.*, 582 N.E.2d 729

(5th Dist. 1991).  In *Camillo,* the court found that Wal-Mart made it impossible for Camillo to meet

---

[14]Plaintiff concedes that if ERISA governs the Plan, it preempts her breach of contract
and Illinois Wage Payment and Collection Act claims.  Pl.'s Mem. at 28.

the condition precedent required to receive his annual bonus because he was required to work through December 31st and he was fired on that day. *Id.* at 731. The court, subsequently, awarded Camillo his bonus. *Id.*

*Camillo,* however, is distinguishable from the case at bar because Plaintiff was not fired from her position at Manor Care. Plaintiff could have continued to work at Manor Care if she had wished. Dabertin Dep. at 118:17-119:3. The court finds that Manor Care did not make it impossible for Plaintiff to fulfill the condition that she be employed at Manor Care on the date of the payout. Accordingly, the court finds that because Plaintiff was not employed at Manor Care as of the date of the payout, she is not entitled to a *pro rata* bonus. *Tatom v. Ameritech Corp.,* 2000 WL 1648931, at *9 (N.D. Ill. Sept. 28, 2000) (holding that *Camillo* does not apply and employee is not entitled to a *pro rata* bonus when employee chose to leave his employment).

Therefore, the court finds that there is no genuine issue of material fact, and Defendants are entitled to summary judgment as a matter of law, with respect to Counts VI and VII.

## CONCLUSION[15]

In view of the foregoing, the court grants Defendants' motion for summary judgment, except such motion is denied as to the significant reduction in the scope of Plaintiff's authority, etc. issue (as set forth at p. 30 of this opinion, *supra*). The Plaintiff's cross-motion for summary judgment is denied.

---

[15]The court reviewed and considered all points raised by Plaintiff and Defendants, including some that were found impracticable and unnecessary to be addressed herein. Thus, the court did consider all of the parties arguments as to the subject cross-motions for summary judgment.

ENTER:

IAN H. LEVIN
United States Magistrate Judge

Dated:  December 20, 2001