# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1702 | **DATE** | 12/19/2002 |
| **CASE TITLE** | Judy Dabertin vs. HCR Manor Care, Inc | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☒ Status hearing set for 1/15/2003 at 10:45 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ☒ [Other docket entry] **Enter memorandum opinion and order. Following bench trial proceedings, and briefs having been filed, judgment on the issue of liability is entered in favor of plaintiff Judy Dabertin and against defendants HCR Manor Care, Inc, Manor Care Inc Sever, and Manor Care Inc. Status hearing set to determine damage issue approach.**

(11) ☒ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | DEC 2 3 2002 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | 105 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 12/20/2002 date mailed notice | |
| SM | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 02 DEC 20 PM 5: 09 Date/time received in central Clerk's Office | SM mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JUDY DABERTIN,                          )
                                        )
    Plaintiff,                          )
                                        )
                     )    **Case No. 99 C 1702**
v.                                      )
                                        )    **Magistrate Judge Ian H. Levin**
HCR MANOR CARE, INC., et al.,           )
                                        )
    Defendants.                         )
                                        )

**DOCKETED**
**DEC 23 2002**

## MEMORANDUM OPINION AND ORDER

Plaintiff Judy Dabertin ("Dabertin") seeks reversal of Defendant HCR Manor Care, Inc.'s (hereinafter "HCR Manor Care") decision denying her Employee Retirement Income Security Act ("ERISA") severance benefits under the Severance Plan for Selected Employees. For the reasons set forth below, the Court reverses the Committee's decision and enters judgment on the issue of liability in favor of Plaintiff.

## BACKGROUND FACTS

Health Care and Retirement Corporation ("HCR") and Manor Care operate skilled nursing facilities. *Dabertin v. HCR Manor Care et al., Inc.*, 177 F.Supp.2d 829, 836 (N.D. Ill. 2001).

Dabertin was a Vice President of Operations of Manor Care at all relevant times hereto, into 1998. In 1998, in contemplation of a merger with a subsidiary of HCR, Manor Care adopted the Severance Plan for Selected Employees (the "Plan"). (PX-16; Transcript of 5/22/02 Hearing ("Tr.") at 28:20-25.) Manor Care designated thirty-nine officers to participate in the Plan. (PX-1 at Ex. A.) Dabertin was one of the selected employees. (*Id.*)

105

Before the Plan was finalized, Paul Ormond, who was designated to become the President and Chief Executive Officer of Manor Care and HCR Manor Care (after the merger), discussed the purpose and goals of the Plan with Stuart Bainum, Jr., who was the Chief Executive Officer of Manor Care prior to the merger. (Tr. at 33:9-34:4.) During their discussions, Ormond noted that Dabertin and other executives would be critical to the success of the merged entity and he did not want to give them incentives to resign from their positions in order to receive severance benefits. (*Id.*) Ormond told Bainum that he was planning to change the operations strategy of the merged entity to require "more hands-on management" and more frequent visits to facilities. (*Id.* at 34:5-35:1.) For example, this change could result in some of the Vice-Presidents of Operations being assigned fewer facilities after the merger so that they could handle their newly intensified job assignments and could also lead to a shift in Manor Care's focus of constructing new facilities to managing existing facilities. (*Id.* at 35:14-36:5.) The change in operating strategy could ultimately result in a number of regional offices being closed in order to encourage managers to work in their facilities. (*Id.*) Ormond and Bainum agreed that these changes in operations strategy would not trigger any entitlement to severance benefits. (*Id.*)

In accordance with Ormond and Bainum's new operating strategy, the Plan provided that a participant was entitled to severance benefits in only two circumstances:

> A Participant shall be entitled to severance benefits under this Plan if and only if his employment with the Company . . . terminates under either of the following circumstances:
>
> (A) a termination by the Company . . . other than for Cause, or
>
> (B) a termination by the Participant for Good Reason.

PX-1 at Article III. The Plan defines "Good Reason" as:

> a significant reduction in the scope of a Participant's authority, position, title, functions, duties or responsibilities . . .

*Id.* ¶ 1.8.

On September 25, 1998, Manor Care merged with HCR and became a subsidiary of HCR. (PX-16 at 1.) At that time, Ormond implemented the planned operational changes in the newly merged entity. (PX-16 at 4; Tr. at 34:5-35:1.) For instance, Ormond first required that the Vice-Presidents of Operations take on the additional role of General Managers. (*Id.*) Next, as part of their new role, the Vice-Presidents had to adopt a more "hands-on management style" and focus more intensively on the day-to-day operations of the facilities assigned to them. (*Id.*) The change in operations strategy meant that the Vice-Presidents had to spend significantly more time in the facilities assigned to them. (*Id.*) The Vice-Presidents had to oversee the day-to-day operations of their facilities which included responsibility in the following areas: workers compensation, staffing levels, accounts receivable, quality of care, and agency utilization. (PX-16 at 4.) Specifically, after the merger, the Vice-Presidents not only retained the authority, functions, duties and responsibilities that they had before the merger, but they also became General Managers with an obligation to fulfill their new authority, functions, duties and responsibilities. (*Id.*)

Prior to the merger, Dabertin had been assigned to both the Central and Western Divisions of Manor Care. (PX 14 at HCR 0060.) However, unlike the facilities in other Manor Care divisions, the facilities in the Western Division were geographically dispersed covering the states of California, Washington, Utah, Nevada and Arizona. (PX-4 at 1; PX-16 at 4.) Because the facilities in the Western Division were geographically dispersed and the new operating philosophy required that the Vice-Presidents visit their facilities frequently and personally oversee the day-to-day operations,

3

Dabertin was assigned only the Western Division after the merger. (PX-16 at 4.) As a result, Dabertin was assigned a smaller number of facilities, beds, direct reports, construction projects, budgeted revenue and operating profit. (*Id.*) Dabertin, however, had a similar scope of authority, functions, duties and responsibilities in her smaller business unit that she had previously had for both the Central and Western Divisions. (*Id.*)

On October 21, 1998, Dabertin resigned from her position as Vice-President of Operations and submitted a claim for benefits to her supervisor, Keith Weikel, Chief Operating Officer. (PX-2; PX-3.) The basis of her claim was that, in accordance with the Plan provisions, she was terminating her employment for "Good Reason" as defined in Section 1.8 of the Plan. (PX-3.) Dabertin asserted that she had "Good Reason" to resign from her position because *inter alia* the number of facilities, beds, budgeted revenue and operating profit, direct reports, and construction projects assigned to her had decreased. (PX-2.)

On November 16, 1998, Weikel sent Dabertin a letter denying her claim for benefits under the Plan. (PX-4.) In his letter, he explained that "a reduction in the size of the business unit you were assigned to manage [does not] alone constitute[] a reduction in the scope of your authority, functions, duties or responsibilities." (*Id.*) Weikel further stated that "[i]n fact, you continue[d] to have the full range of authority, duties, responsibilities and functions with respect to the facilities in your division as you did prior to the merger." (*Id.*)

Dabertin appealed Weikel's decision to the Committee[1] on November 18, 1998. (PX-5.)

[1]In accordance with the Plan's provisions, a Committee was appointed by Manor Care's Board of Directors to administer the Plan. (PX-1, Plan §§ 1.6, 5.1.) The Committee has discretion to "interpret the provisions of the Plan and . . . determine all questions arising in the administration thereof, including without limitation the reconciliation of any inconsistent provisions, the resolution of any ambiguities, the correction of defects, and the supplying of

Moreover, on January 12, 1999, Dabertin's attorney submitted a twenty-three page single-spaced letter (position paper) explaining her claim. (PX-14.)

On January 14, 1999, Ormond and three other Committee members, Geoffrey Meyers, Wade O'Brien, and Nancy Edwards met to determine if Dabertin was entitled to receive benefits under the Plan.[2] (Tr. at 29:9-30:7; O'Brien Dep. at 26:19-27:2; Meyers Dep. at 9:19-10:7.) The Committee discussed Dabertin's claim and twenty-three page letter for more than an hour. (Tr. at 30:8-9, 31:18-32:2.) During the discussion, Ormond told the Committee that he had spoken with Bainum about the purpose and goals of the Plan. (Tr. at 33:9-34:4.) Specifically, he said that the goal of the Plan was to make sure that Dabertin and other executives who were critical to the success of the newly merged entity would not have an incentive to resign from their positions in order to receive severance benefits. (*Id.*) In particular, the planned operational changes; such as a reduction in facilities assigned to a Vice President, the closing of regional offices and fewer construction projects, would not trigger a right to severance benefits. (*Id.*)

Ormond, Meyers, O'Brien and Edwards interpreted the provisions of the Plan and decided to deny Dabertin's claim for severance benefits. (PX-16.) Jeff Bixler, who served as the secretary for the meeting, prepared a summary of the Committee's discussions regarding Dabertin's claim.[3]

---

omissions." (*Id.* § 5.1.) The Plan further provided that "[i]n the event that a claim for a benefit under the Plan has been denied, the decision shall be subject to review by the Committee upon written request of the claimant . . . " (*Id.* § 5.2.) Therefore, "[t]he decision of the Committee upon review shall be final and binding on all persons." (*Id.*)

[2]Before the meeting, Dabertin's position paper was distributed to the Committee. The Committee also received copies of the Plan, Dabertin's October 21, 1998 letter to Weikel seeking benefits under the Plan, and Weikel's November 16, 1998 letter denying her claim and appeal. (PX-12; Tr. at 31:18-32:2.)

[3]On January 18, 1999, the Committee faxed Dabertin a copy of the minutes outlining the issues discussed on January 14, 1999 and its decision to deny her claim. (Defs.' Ex. 22, Jan. 18,

In denying Dabertin's claim for severance benefits, the Committee determined that "if a Participant continues to have a full range of operational, financial, administrative and other authority, functions, duties and responsibilities with respect to the business unit the Participant manages, the scope of the Participant's authority, duties, functions and responsibilities would not be affected." (PX-16 at 2 (emphasis in original).) The Committee found that although Dabertin "manage[d] [a smaller business unit], she still had a full scope of financial, operational, administrative and strategic authority, functions, duties and responsibilities." (PX-16 at 4.)

The Committee also found that Dabertin was not entitled to severance benefits for the independent reason that her job got harder after the merger, and the scope of her authority, functions, duties and responsibilities "significantly increased." (PX-16 at 4.) For instance, after the merger, Dabertin "w[as] expected to spend significantly more time in [her] facilities . . . and . . . [was] required to be more involved in the day-to-day oversight of the centers in the areas of quality of care, staffing levels, accounts receivables, workers compensation and agency utilization." (*Id.*)

Furthermore, the Committee determined that Dabertin's title and position were not significantly reduced. (PX-16.) For example, Dabertin remained as a Vice-President of Manor Care, she was given the additional position and title of General Manager of Manor Care, and she received the additional position and title of Divisional Vice-President and General Manager of HCR Manor Care. (PX-16 at 1, 3-4.) The Committee also determined that Dabertin's position was enhanced by the fact that the newly merged entity, HCR Manor Care, was "approximately twice as large as" it had been before the merger. (PX-16 at 3-4.)

## LEGAL STANDARD

---

1999 Ltr. from Bixler to Denis.)

In *Dabertin v. HCR Manor Care, Inc. et al.*, 177 F.Supp.2d 829, 844 (N.D. Ill. 2001), this Court determined that it "w[ould] review the Committee's decision under the arbitrary and capricious standard." In reviewing the Committee's decision under the arbitrary and capricious standard, a court can only review a committee's interpretation of a plan, not the plan language. *Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 898 (7th Cir. 1993). A court may not interfere with the plan administrator's decision unless he "not only made the wrong call, but . . . a 'downright unreasonable' one." *James v. Gen. Motors Corp.*, 230 F.3d 315, 317 (7th Cir. 2000) (citation omitted). "It does not matter whether the result reached by the administrator is one [the court] would have reached in the first instance." *Id.* Accordingly, "[a] denial of benefits will not be set aside if it was based upon a reasonable interpretation of the plan documents." *Id.* In other words, a court must uphold a decision so long as that decision is based on a reasonable interpretation of the plan's language and the evidence in the case. *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 68 (7th Cir. 1996). Therefore, all questions of judgment are left to the plan, and "a court must be very confident that the plan overlooked something important or seriously erred in appreciating the significance of evidence" to overturn the plan's determination. *Wahlin v. Sears, Roebuck & Co.*, 78 F.3d 1232, 1235 (7th Cir. 1996); *see also Kubica v. Washington Nat'l Ins. Co.*, No. 99 CV 6250, 2000 WL 1231554, at *4 (N.D. Ill. Aug. 28, 2000). "In other words, it is hard to overturn a decision of a plan administrator." *James*, 230 F.3d at 317.

However, although the arbitrary and capricious standard grants deference to the plan's determination of eligibility, the court's review is not a "rubber stamp." *Swaback v. Am. Info. Tech. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996). "Deferential review is not no review" and "deference need not be abject." *Hess v. Hartford Life and Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)(citation

7

omitted). "[F]ederal common law principles of contract interpretation govern. These principles require us to interpret terms of ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience." *Swaback*, 103 F.3d at 540-41. "If fiduciaries or administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious." *Id.* and cases cited at *id.* 540 n.9. As recently stated in *Hess*, disregard of "the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." *Hess*, 274 F.3d at 461.

## ISSUE

The issue before the Court is whether the Committee was arbitrary and capricious in its determination that Dabertin had not suffered "a significant reduction in the scope of [her] authority, position, title, functions, duties or responsibilities." (*citing* Article1.8(i) of the Plan.) *Dabertin*, 177 F.Supp.2d at 852 (summary judgment decision denying Defendant's motion for summary judgment and finding that "a genuine issue of material fact(s) exists as to whether the Committee's determination that Plaintiff did not suffer a significant reduction in the scope of her authority, position, title, functions, duties or responsibilities was arbitrary and capricious (i.e. downright unreasonable)."[4]

## ANALYSIS

### I.    Arguments

Dabertin asserts that according to Article 1.8(i) of the Plan that she was entitled to receive

---

[4]Seventh Circuit case law stands for the proposition that the proper procedure and proceeding for the issue(s) presently before the Court is akin to a bench trial, which consists, essentially, of review on the administrative record of the proceeding below. *Hess v. Hartford Life and Accident Ins. Co.,* 274 F.3d 456, 460-61 *et seq.* (7th Cir. 2001); *see also Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan,* 195 F.3d 975, 978 *et seq.* (7th Cir. 1999). This, accordingly, was the procedure followed by the Court herein.

$885,000 in severance pay if, she resigned as a result of "a significant reduction in the scope of [her] authority, position, title, functions, duties or responsibilities." (Pl.'s Mem. at 1 (*citing* Article 1.8(i).) In reliance on the Plan's promise, Dabertin gave timely notice of her termination under the Plan's (Article III) three month notice clause. (*Id.*) Specifically, Dabertin contends *inter alia* that (1) her job was "axed in half" and she lost her authority, position, title, functions, duties and responsibilities for the Central (Chicago) Division; (2) her authority, position, functions, duties and responsibilities for independent capital spending, cluster market management, the AM Group, the MedBridge division, as well as hiring and firing with respect to more than seventy-three staff employees and two offices, advertising, public relations, consulting, business meetings, seminars and conventions were eliminated; and (3) her authority, position, functions, duties and responsibilities for construction and new property projects were frozen. (*Id.*)

In rejecting her claim for severance benefits under the Plan, Dabertin contends that the Committee did not dispute the changes that she alleged occurred. (Pl.'s Mem. at 2.) Rather, the Committee concluded that the "scope" of Dabertin's authority, position, title, functions, duties and responsibilities had not been significantly reduced. (*Id.*) Consequently, as a result, Dabertin asserts that the Committee's decision to deny her severance benefits under the Plan was downright unreasonable and should be overturned by the Court.

HCR Manor Care, on the other hand, asserts that Dabertin was entitled to severance benefits only if she was fired or her job was "gutted" by "significant[ly] reduc[ing] the scope of [her] authority, position, title, functions, duties or responsibilities." (Defs.' Resp. at 1 (*citing* Article 1.8(i).) HCR Manor Care claims that Dabertin was not entitled to severance benefits because (1) although she "manage[d] [a smaller business unit], she still had a full scope of financial, operational,

9

administrative and strategic authority, functions, duties, and responsibilities;"(2) her "job got harder after the merger" and the scope of her authority, functions, duties and responsibilities significantly increased because she was required to spend significantly more time in her facilities and take on the additional role of General Manager by overseeing the day-to-day operations of her facilities; and (3) she remained a Vice-President of Manor Care, and received the additional positions and titles of General Manager of Manor Care and Divisional Vice-President and General Manager of HCR Manor Care which lead to an increase in the scope of her title and position rather than a "significant reduction." (PX 16 at 4; Defs.' Resp. at 2,7).

HCR Manor Care, therefore, contends that the Committee's decision in denying Dabertin severance benefits under the Plan was not downright unreasonable; consequently, the Court should affirm the Committee's decision.

## II. THE COMMITTEE WAS "DOWNRIGHT UNREASONABLE" IN DETERMINING THAT DABERTIN DID NOT SUFFER A SIGNIFICANT REDUCTION IN THE SCOPE OF HER AUTHORITY, POSITION, TITLE, FUNCTIONS, DUTIES OR RESPONSIBILITIES.

For the reasons set forth below, the Court finds that the Committee's decision that Dabertin did not suffer a significant reduction in the scope of her "authority, position, title, functions, duties or responsibilities" was arbitrary and capricious.

Dabertin argues that she suffered a significant reduction in the scope of her authority, functions, duties or responsibilities (as well as position and title) when HCR Manor Care assigned her only the Western Division and eliminated much of her authority as well as many of her functions, duties or responsibilities that she had previously been assigned. (Pl.'s Mem. at 7-8.) For example, in her January 12, 1999 twenty-three page submission to the Committee, Dabertin listed examples where the scope of her authority had been drastically cut. (Id.) Specifically, Dabertin contends that

10

she lost: (1) her independent capital spending authority; (2) her hiring and firing authority over two offices which included seventy-three staff members (i.e., Lombard, Illinois and Pleasant Hill, California); (3) half of her direct reports; and (4) her authority over construction projects was eliminated. (*Id.*; PX-14 at 16, 18, 19, 21-22.) Dabertin, thus, asserts that even when judged by the Committee's "financial, operational, administrative and strategic rationale, those changes involved, by "simple common sense" a significant reduction in the scope of her authority. (Pl.'s Mem. at 7.) *See e.g., Hess,* 274 F.3d at 461.

Dabertin further asserts that she suffered a significant reduction in the scope of her functions, duties and responsibilities even though the Committee arbitrarily lumped these categories together as if the terms were interchangeable. (Pl.'s Mem. at 8.) For instance, Dabertin contends that she lost key components of her job involving: (1) her cluster market management (Cluster Market SSI - Central region); (2) the AM Group (Central region); (3) the MedBridge Division (Central region) and (4) the Western Division's construction projects. (Pl.'s Mem. at 8; PX-14 at 4, 6, 9, 20-22.) In addition, according to Dabertin, her authority, functions, duties and responsibilities for advertising, public relations, consulting, business meetings, seminars and conventions were eliminated. (Pl.'s Mem. at 8.) Thus, Dabertin states that regardless of how these changes are defined (e.g., functions, duties, or responsibilities), "simple common sense" indicates that these changes constituted a significant reduction in the scope of her functions, duties and responsibilities. (*Id.*)

HCR Manor Care asserts that the Committee's decision that Dabertin did not suffer a significant reduction in the scope of her authority, functions, duties or responsibilities was not "downright unreasonable" when, after the merger, she was assigned only the Western Division. (Defs.' Resp. at 13.) Specifically, after the merger, Dabertin was expected to spend significantly

more time in her facilities and personally oversee the day-to-day operations of the facilities in the areas of quality of care, staffing levels, accounts receivable, workers compensation and agency utilization. (Defs.' Resp. at 13; PX-16 at 4.) Thus, in order to enable Dabertin to handle her increased scope of authority, functions, duties and responsibilities, Manor Care reduced the number of facilities in the business unit she was managing. (Defs.' Resp. at 13.) As a result of this reduction, Dabertin lost *inter alia* direct reports, beds, construction projects and the size of her budgets decreased. (*Id.*) However, according to HCR Manor Care, as long as the range of Dabertin's authority, functions, duties and responsibilities for those beds, direct reports, budget and construction projects she was assigned was similar both before and after the merger, she did not suffer a significant reduction in the scope of her authority, functions, duties and responsibilities. (*Id.*) Therefore, HCR Manor Care contends that, in light of Dabertin's newly intensified job assignment, the Committee was not "downright unreasonable" in determining that the scope of her authority, functions, duties and responsibilities had significantly increased (and not been reduced) after the merger. (*Id.* at 13-14.)

In addition, HCR Manor Care further asserts that Dabertin has failed to identify any significant authority, function, duty or responsibility that she lost after the merger. (Defs.' Resp. at 16.) First, HCR Manor Care contends that even though Dabertin asserts that she lost her capital spending authority and her support role for the AM Group after the merger, she only mentioned these losses briefly[5] in her twenty-three page submission and, notwithstanding her allegations, the

---

[5] HCR Manor Care further asserts that even Dabertin did not appear to believe that the alleged reduction in her capital expenditure authority or her support role for the AM Group was significant because she did not mention either of these items when she initially sought benefits on October 21, 1998 from Weikel. (PX-2.) However, several months later, in her January 12, 1999 twenty-three page submission she finally mentioned the alleged loss of her capital spending

Committee found that "[w]ith respect to the business unit [Dabertin] continued to manage, she still had a full scope of the financial, operational, administrative and strategic authority, functions, duties and responsibilities." (Defs.' Resp. at 16; PX-16 at 4.) Next, HCR Manor Care argues that the record does not support the fact that Dabertin would "no longer be implementing the Cluster Market SSI" project or developing the "MedBridge product management model" because nowhere in the record did she claim that she would not have the same authority, functions, duties and responsibilities for the Cluster Market SSI or MedBridge model in the Western Division. (Defs.' Resp. at 17; PX-14 at 4, 19-20.) In addition, with respect to construction projects, Dabertin claims that her "responsibilities for and participation in managing, developing and providing input for construction projects" was "significantly truncated" and that her "role in developing projects, participating in construction development meetings, touring and approving new sites, reviewing and approving proformas [sic] for new projects prior to their submission to the Board of Directors" was "significantly abridged." (Defs.' Resp. at 17; PX-14 at 16.) Thus, according to HCR Manor Care, Dabertin did not articulate how her construction authority, functions, duties and responsibilities were eliminated; consequently, she continued to have the full scope of authority, functions, duties and responsibilities for the remaining projects in the Western Division. (Defs.' Resp. at 18.) Finally, Dabertin's claim that she lost "hiring and firing authority" over the Lombard, Illinois and Pleasant Hill, California offices which comprised 73 staff members and she lost half of her direct reports is belied by the fact that she continued to have hiring and firing authority over other employees and

authority by burying the claim in three lines on page 18 of the submission. (Defs.' Resp. at 17.) Moreover, she also buried her claim about the loss of her support role for the AM Group in a single line on page 20 of the submission. (*Id.*) Thus, according to HCR Manor Care, her own cursory description of the task as "supporting" the AM Group hardly makes the alleged loss seem significant. (*Id.*)

direct reports; thus, as a result, she did not suffer any reduction in the scope of her hiring and firing authority. (*Id.*)

The Court agrees with Dabertin and finds, for the following reasons, that the Committee's decision regarding its denial of her severance benefits was arbitrary and capricious.

Specifically, Dabertin was subjected to losses or reductions in the following areas as a result of the merger:

- Independent capital spending authority was reduced from $6 million to $0.[6] (PX-14 at 18, par. 14.)

- Overhead budget development and implementation responsibilities and authority for advertising, public relations, consulting, business meetings, seminars and conventions were eliminated. (Compare PX-14 at 13-14, par. 8 to p. 15, par. 8.)

- Management functions including hiring and firing authority for seventy-three staff members located in the Lombard, Illinois and Pleasant Hill, California offices were eliminated. (PX-14 at 19, par. 16; p. 22, par. 4.)

- Independent authority to manage her total budget was eliminated. (PX-14 at 19, par. 18.)

- Cluster market management (Cluster Market SSI - Central region); the MedBridge Division (Central region) product management; and the AM Group (Central region) functions and responsibilities were eliminated. (PX-14 at 4, par. 3; p. 6, par. 5(3); p. 9, par. 5(9); p. 20, par. 19.)

- Construction project authority, functions and responsibilities for twenty sites in the Western Division were discontinued. (PX-14 at 21-22.)

- Decisional and work authority for: building license deadlines, scheduling first patient days and opening receptions, starting and finishing construction, reporting on construction and contract completion, licensing decisions,

---

[6]Prior to the merger, Dabertin had authority to authorize capital spending for up to $50,000 per project per year, up to an aggregate amount of $150,000 per year, plus $6 million that was already budgeted. After the merger, she had no independent capital spending authority. (PX-14 at 18, par. 14.)

14

obtaining certificates of occupancy, groundbreaking events, obtaining zoning approval deadlines, scheduling drawing completion dates and city council hearings, handling appeals from zoning hearings, county pre-application meetings, projects under contract, and market feasibility studies, as well as identifying and reviewing over 50 projects/markets prior to July 27, 1998 which included reports and decisions about particular products (i.e., AC, SH, or SNF, study completion dates, recommendations about each individual market feasibility project, and the number of potential projects) were eliminated. (PX-14 at 16-17, par. 10(1))

- Operational, administrative and strategic authority, position, title, functions, duties or responsibilities" for one of Manor Care's "largest most complex markets" (i.e., Central region) were eliminated. (PX-14 at 4, par. 1.)

Moreover, the Court notes that there were also other significant changes in Dabertin's financial, operational, administrative and strategic authority, functions, duties or responsibilities after the merger. For example, Dabertin's (1) overall budget authority previously included 60 assigned areas totaling $4,114,152, but had been reduced to only 22 areas (advertising, public relations, consulting, business meetings, seminars and conventions had been eliminated) totaling $249,034; (2) the number of skilled nursing units had been reduced from 34 to 17; (3) the number of skilled nursing facilities had been reduced from 48 to 27; (4) the number of beds had been reduced from 4,639 to 2,309; (5) budgeted revenue had been reduced from $232,000,000 to $114,000,000; (6) budgeted operating profit had been reduced from $61,000,000 to $27,000,000; (7) new construction projects were reduced from 20 to zero; and (8) direct reports were reduced from ten to five. (PX-14 at 13-14, par. 8; p. 15, par. 8; p. 16, par. 9.)

Given these recited losses and reductions, it is clear that under the Plan's "plain language," and considering "simple common sense," the Committee "overlooked something important" and "seriously erred in appreciating the significance of evidence." *Hess*, 274 F.3d at 461; *Wahlin*, 78 F.3d at 1235. The Court thus concludes the Committee acted arbitrarily and capriciously and was "downright unreasonable" when it determined that Dabertin did not suffer, in the Plan's language,

a significant reduction in the scope of her "authority, position, title, functions, duties or responsibilities."[7]

## III. THE COMMITTEE'S DEFINITION OF THE TERM "SCOPE" WAS "DOWNRIGHT UNREASONABLE" AND NOT IN ACCORDANCE WITH ITS ORDINARY, POPULAR MEANING.

Dabertin asserts that HCR Manor Care's "scope" rationale ignores the significant changes that occurred in her job involving her "space or opportunity for unhampered activity," "extent of activity or influence," or "range of operation," which are the ordinary meanings of the term "scope" (*see Webster's New Collegiate Dictionary* (1977), at 1035). (Pl.'s Reply at 1.) In addition, Dabertin contends that HCR Manor Care's "scope" rationale nullifies the reasonable expectations of Plan participants who relied on the ordinary, popular meaning of Article 1.8(i)'s language. (*Id.*)

In interpreting the Plan's provisions,[8] HCR Manor Care asserts that the Committee determined that "if a Participant continues to have a full range of operational, financial, administrative and other authority, functions, duties and responsibilities with respect to the business unit the Participant manages, the scope of the Participant's authority, duties, functions and responsibilities would not be affected." (PX-16 at 2 (emphasis in original); Defs.' Resp. at 10.) In other words, the Committee interpreted the term "scope" to mean that "if Mrs. Dabertin had certain duties, responsibilities, and functions for 100 facilities before the merger and had the same duties, responsibilities, and functions for 50 facilities after the merger, she would not suffer a significant

---

[7]HCR Manor Care's citation of *Collins v. Ralston Purina Co.,* 147 F.3d 592 (7th Cir. 1998), respectfully, is unavailing. Simply put, the court never decided the issue of whether Collins suffered a substantial reduction of his duties or responsibilities. (147 F.3d at 600).

[8]Pursuant to the terms of the Plan, the Committee has discretion "to interpret the provisions of the Plan and . . . determine all questions arising in the administration thereof, including without limitation the reconciliation of any inconsistent provisions, the resolution of any ambiguities, the correction of defects, and the supplying of omissions." (PX-1, Plan § 5.1.)

reduction in the scope of her duties, responsibilities, or functions." (Defs.' Resp. at 10.) Therefore, according to HCR Manor Care, the Committee's interpretation of the term "scope" is consistent with the goals of the Plan[9] as the Committee understood them from Ormond.[10]

Next, HCR Manor Care asserts that the Plan uses the term "scope;" thereby, differentiating the Plan from other severance plans. (Defs.' Resp. at 9.) For example, according to HCR Manor Care, other severance plans commonly provide that a simple reduction in duties and responsibilities triggers a participant's right to severance benefits. (*Id.*) *See e.g., Bowles v. Quantum Chem. Co.,* 266 F.3d 622, 626 (7th Cir. 2001)(employees were entitled to severance benefits if they experience "a diminution [] of authority, duties, responsibilities or status"); *Collins v. Ralston Purina Co.,* 147 F.3d 592, 594 (7th Cir. 1998)(participants were entitled to severance benefits if they suffered "any substantial reduction of duties or responsibilities"); *Robertson v. Rubbermaid Inc.,* No. IP99-0307-C-M/S, 2000 WL 33309371, at *5 n.2 (S.D. Ind. Mar. 31, 2000)(certain executives were entitled to severance benefits if they "suffered substantial reduction in any of the authorities, powers, functions, responsibilities or duties attached to the position held by" that executive). However, HCR Manor Care contends, that in contrast, none of the plans in the above-referenced cases use the term "scope;"

---

[9]As expressed by HCR Manor Care: unlike many severance plans, the Plan is not a "golden parachute" that provides large severance packages to executives when there is a change in the operations or control of Manor Care. (Def.'s Resp. at 8.) Rather, the goal of the Plan was to provide severance benefits to executives whose positions were "gutted" as a result of the merger. (*Id.* at 8-9.) The Plan, however, was not designed to give Dabertin and other executives who were critical to the success of the merged entity an incentive to resign from their positions to receive severance benefits. (*Id.* at 9.) Rather, the Plan was designed so that contemplated changes in the operations strategy (e.g., the reduction in the number of facilities and construction projects assigned to some Vice-Presidents) would not trigger these executives' rights to severance benefits. (*Id.* at 9.)

[10]HCR Manor Care also asserts that the Committee's interpretation is consistent with the definition that Dabertin proposed in her own position paper when she defined "scope" as "breadth, span, latitude and orbit." (PX-15, at 5, 6, 10.)

17

rather, they simply require that the plan administrator determine whether a participant's duties and responsibilities have decreased. (Defs.' Resp. at 9.) As such, they are easily triggered by a merger or business reorganization. (*Id.*) The Committee, however, was required to give effect to the term "scope" and not render it meaningless.[11]

HCR Manor Care further contends that the Committee's interpretation of the Plan provisions is "conclusive and binding on all persons," and the Court may not interfere with the Committee's interpretation unless it "not only made the wrong call, but . . . a 'downright unreasonable' one." *James,* 230 F.3d at 317 (citation omitted). Thus, according to HCR Manor Care, the Committee's interpretation of the term "scope" was not downright unreasonable and, moreover, Dabertin has failed to offer an alternative reading of the Plan that gives meaning to the term "scope" and, in essence, would read the term "scope" out of the Plan. (Defs.' Resp. at 10-11.)

The Court agrees with Dabertin and finds that HCR Manor Care's interpretation or definition of the term "scope" was arbitrary and capricious and not in accord with its ordinary, popular meaning. For instance, as Dabertin asserts, the Committee's determination regarding its "scope" rationale was downright unreasonable because a Plan participant reading the Article 1.8(i) language would not reasonably conclude that job changes similar to Dabertin's would not constitute a significant reduction in the scope of a Participant's job or position. (Pl.'s Reply at 2.) Moreover, the Committee's "scope" rationale was "downright unreasonable" because no Plan participant could

---

[11]HCR Manor Care asserts that even the cases cited by Dabertin hold that the Committee had an obligation to give effect to the term "scope" and not render it meaningless. *See Cozzie v. Metro. Life Ins. Co.,* 140 F.3d 1104, 1109 n.3 (7th Cir. 1998)(a plan administrator cannot interpret a plan to "render[] any of the plan language inconsistent or meaningless"); *see also Miles v. The New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 599 (2d Cir. 1983)("where [the administrator] . . . by [his] interpretation render[s] some provisions of the plan superfluous, [his] actions may well be found to be arbitrary and capricious") (citations omitted), *cert. denied,* 464 U.S. 829 (1983).

reasonably foresee that such job changes would not qualify for benefits under the Plan. (*Id.*)

Moreover, the Court notes that HCR Manor Care acknowledges that the "ordinary and popular sense" of the Plan's language controls. (Defs.' Resp. at 12.) For example, a lay person could reasonably conclude that the phrase "scope of a Participant's authority, position, title, functions, duties or responsibilities" when applied to a Vice-President of Operations for the Central/Western Division would mean the common measures of that Vice-President's authority, functions, duties and responsibilities over and involving beds, facilities, employees, budgets, and projects manager or supervised. In the ordinary and popular sense then the number of beds, facilities, projects and direct reports would define the scope or extent of such an employee's authority, position, functions, duties or responsibilities. HCR Manor Care, however, adopted a definition of the term "scope" that was beyond the ken of "a person of average intelligence and experience." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 462 (7th Cir. 1997).

In addition, the Committee unreasonably defined the term "scope" to mean "business unit" and then concluded that Dabertin had the same business unit; therefore, there was no significant reduction in the scope of her authority, position, title, functions, duties, or responsibilities. The Committee's approach was arbitrary and capricious because arguably Dabertin had two business units before the merger: the Chicago Division and the Western Division. Thus, by equating the term "scope" to mean solely a "business" unit," the Committee arbitrarily ignored other measures that, in the ordinary and popular sense, defined the scope or extent of Dabertin's position; such as, the number of beds, employees, facilities and size of the budgets she managed. Therefore, the Committee unreasonably ignored the more definitive measures of Dabertin's position, which constituted measures whereby a lay person, when faced with a significant reduction in the scope of his or her position, would have reasonably considered.

19

## IV. THE COMMITTEE'S INTERPRETATION OF THE PLAN WAS "DOWNRIGHT UNREASONABLE" BECAUSE IT ARBITRARILY ADDED NEW CRITERIA THAT WAS NOT PART OF THE PLAN.

Dabertin asserts that the Committee imposed new criteria not contained in the Plan itself. (Pl.'s Mem. at 9.) Specifically, Dabertin contends that the Committee's imposition of new criteria had the effect of amending the Plan, and was, in itself, arbitrary. (*Id.*) HCR Manor Care, on the other hand, asserts that the Committee was required to give effect to every term in the Plan and its interpretation of the Plan was far from "downright unreasonable." (Def.'s Resp. at 8.)

The Court agrees with Dabertin and finds that the Committee imposed new criteria which in effect either amended or modified the terms of the Plan.[12] *See e.g., Swaback,* 103 F.3d at 542 (it is arbitrary for an administrator to "deviate[] from the clear language of the written plan and impose[] requirements that were not part of the [plan]").[13] First, the Court notes that Article 1.8(i)

---

[12]The Committee's decision engrafted several additional qualifiers before a Plan participant satisfied Article 1.8(i): (1) that "if a Participant continues to have a full range of operational, financial, administrative and other authority, functions, duties and responsibilities with respect to the business unit the Participant manages, the scope of the Participant's authority, functions and responsibilities would not be affected;" (2) "that absent a significant adverse effect on the Participant's status in the organization (e.g., reporting relationships, participation in major decisions, etc.) or a significant reduction in the scope of the Participant's authority, duties, functions or responsibilities with respect to the business unit for which the Participant has responsibility, a significant reduction under Section 1.8(i) has not occurred;" and (3) the purpose of Article 1.8(i) is only to preclude changes that make a Participant's continued employment "degrading or humiliating." (PX-16 at 2.)

[13]*Accord: O'Shea v. First Manhattan Co. Thrift Plan & Trust,* 55 F.3d 109, 112 (2nd Cir. 1995)(a decision is arbitrary "'[w]here the trustees of a plan impose a standard not required by the plan's provisions'")(quotation omitted). *See e.g., Epright v. Envtl., Resources Mgmt., Inc. Health and Welfare Plan,* 81 F.3d 335, 342 (3rd Cir. 1996)(finding that imposing "a standard not required by the Plan" is essentially "an amendment to the Plan that has not been incorporated into the Plan document"). Like in *Epright,* the Committee, "[b]y imposing a requirement which is extrinsic to the Plan . . . acted arbitrarily and capriciously." *Id.* at 342-43. *See also Univ. Hospitals of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 850 (6th Cir. 2000)(rejecting a similar "attempt to impose an additional and one-sided limitation not stated in the Plan itself"

of the Plan does not refer to changes in the "business unit [a] Participant manages." (PX-1 at 2.) For instance, the Committee's Decision itself recognizes, "Section 1.8(i) does not expressly reference the size of the business unit . . ." (PX-16 at 2.) There is also no language in the Plan requiring "a significant adverse effect," or requiring such an effect on a Participant's "status in the organization (e.g., reporting relationships, participation in major decisions, etc.)" (*Id.*) Moreover, there is no Plan requirement that only precludes changes that make a Participant's continued employment "degrading or humiliating." (*Id.*) Yet, respectfully, the Committee added these three new limitations to the Plan's language. These three new limitations constitute modifications to the Plan and not merely an interpretation of it. As recognized in *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1108 (7th Cir. 1998)("[i]nterpretation and modification are different; the power to do the first does not imply the power to do the second").

The Court also notes that the "adverse effects" or "affected" standards imposed by the Committee are the not the same as Article 1.8(i)'s "significant reduction" language. Moreover, the Committee also superimposed "status" as a test as if "status" was part of the Plan's six listed criteria. (i.e., authority, position, title, functions, duties or responsibilities.) (PX-1 at 2.) Nowhere in the Plan, however, is the word "status" used. (*See* PX-1.) The Committee, therefore, acted arbitrarily when it added requirements to the Plan's plain "significant reduction" requirement.

Dabertin was entitled to rely on the plain and ordinary meaning of the Plan's language at the time she made her termination decision. Therefore, the Court finds that the incorporation of the Committee's *post hoc* rationalizations; namely, the three new extraneous tests for satisfying the

---

and applying the rule of *contra proferentum* to preclude a benefits committee "from finding an 'ambiguity' in the Plan's [language], . . . and then invoking its discretionary power to 'construe' [the] provision in the Plan's favor").

"significant reduction" language of Article 1.8(i) of the Plan were arbitrary and capricious.[14] As a result, the Committee's decision regarding Dabertin's claim for severance benefits was "downright unreasonable" because the Committee failed to follow the ordinary, plain meaning of the Plan's language.

**V.**

In concluding, because the Committee's review of the evidence in the case was arbitrary and "downright unreasonable," the Court may award benefits without a remand to the plan administrator (i.e., Committee). *See e.g., Govindarajan v. FMC Corp.,* 932 F.2d 634, 637 (7th Cir. 1991); *Grossmuller v. Int'l Union, United Automobile Aerospace and Agricultural Implement Workers of Am., UAW, Local 813,* 715 F.2d 853, 858-59 (3rd Cir. 1983)(reinstatement of benefits awarded because the claims procedure did not comply with ERISA's full and fair review); *Canseco v. Constr. Laborers Pension Trust for Southern California,* 93 F.3d 600, 609-10 (9th Cir. 1991)(remand is inappropriate because no factual determinations needed to be made); *Miller v. United Welfare Fund,* 72 F.3d 1066, 1071 (2d Cir. 1995)(when the arbitrary and capricious standard applies, remand

------

[14]According to Ormond, "because the changes in Judy Dabertin's job had been considered and anticipated and discussed prior to the finalization of this [P]lan," she did not meet "the threshold for qualifying [for severance benefits]." (Tr. at 36:15-18.) The Plan's plain language, however, does not foreclose eligibility because a Participant's changes in authority, position, title, functions, duties or responsibilities has been considered, anticipated, or discussed. The Plan's language addressed whether there were changes in a Participant's position or job, not the reasons for these changes or whether there were business reasons precipitating the changes. The language Dabertin relied on focused on whether there was a change, not the basis for the change. Whether Bainum, the former Chief Executive Officer (chairman) of Manor Care, agreed with the business changes is also not relevant. Moreover, at no time was Dabertin apprised of Bainum's comments or Ormond's rationale. As HCR Manor Care acknowledges (Defs.' Mem. at 12), the Committee was required to interpret the Plan "in an ordinary and popular sense." Dabertin, therefore, was entitled to rely on the plain meaning of the written Plan language.

22

is unnecessary if it would be a "useless gesture").[15] *Cf. Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996)(remand because adequate findings of fact were not made by the court or agency). Accordingly, the Court overturns the Committee's decision and awards severance benefits to Dabertin.[16]

## CONCLUSION[17]

In view of the foregoing, the Court reverses the Committee's decision and enters judgment on the issue of liability in favor of the Plaintiff.[18]

---

[15]In *Miller* the court stated: "We follow the majority of our sister circuits in concluding that a district court's review under the arbitrary and capricious standard is limited to the administrative record. Because district courts are required to limit their review to the administrative record, it follows that, if upon review a district court concludes that the Trustees" decision was arbitrary and capricious, it must remand to the Trustees with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a "useless formality." *See Wardle v. Central States, Southeast & Southwest Areas Pension Fund,* 627 F.2d 820, 828 (7th Cir. 1980) (citation omitted). The *Miller* court, however, remanded the cause because it was unclear that the claim should be granted. *Miller,* 72 F.3d at 1073-74.

[16]The Court finds that the briefs are factually undeveloped on the issue of damages, including certain matters first sought to be raised in the reply brief. Accordingly, further proceedings need to be scheduled on the issue of damages.

[17]Even though the Court deems it unnecessary to reach Dabertin's argument that HCR Manor Care relied on "facts" that were not in the written administrative record and not in Ormond's "supplemental" oral testimony, the Court notes that Dabertin is correct on at least many of these points. (*See* Pl.'s Reply at 8.)

[18]The Court reviewed and considered all of the points raised by Defendants, including some that were found impracticable and unnecessary to be addressed herein. In view of the Court's ruling, the Court deems it unnecessary to address the other arguments made by Plaintiff in its briefs here.

ENTER:

IAN H. LEVIN
United States Magistrate Judge


Dated:  December 19, 2002